In re ADOPTION OF A MINOR.
No. 8665.

United States Court of Appeals
District of Columbia.
Decided July 17, 1944.

---

9 Shewmaker v. Capital Transit Co., —— U.S.App., ——, 143 F.2d 142, and authorities there collected.

Mr. Nathan M. Lubar, of Washington, D. C., with whom Mr. Alvin L. Newmyer, of Washington, D. C., was on the brief, for appellants.

Miss Catherine McCloskey, of Washington, D. C., for appellee.

Before GRONER, Chief Justice, and MILLER and ARNOLD, Associate Justices.

MILLER, Associate Justice.

This is an appeal from a judgment of the District Court denying a petition for adoption of an illegitimate infant. The single issue of the case is one of law, whether a natural mother, who has freely and voluntarily given consent to the adoption of her illegitimate child, can, without cause, withdraw that consent and thus prevent the adoption when, as in the present case, the adoptive parents have accepted the child, paid the expenses of prenatal and postnatal care, made a home for the child and in all respects satisfied the requirements of the law governing adoption. Although other issues were presented to us, the opinion of the trial judge[1] and the judgment itself[2] reveal that the case was decided upon this issue alone.

In support of the judgment appellee contends that a different rule prevails, concerning consents of parents for adop-

[1] "On May 10, 1943 the petitioners filed a petition for the adoption of * * * an illegitimate child, born on May 5, 1943. Before the birth of the child, the mother signed the paper filed with petition consenting to surrender the child for adoption and stating that 'I respectfully join in the prayer of the petition for adoption.' After the birth of the child she acknowledged this paper before a notary public. The child was placed with the adopting parents for adoption and on May 10, 1943 the matter was referred to the Board of Public Welfare; the child, in the meantime, being in the custody of the adopting parents. On July 3, 1943, petition was filed by the next friend of the natural mother, who is a minor, *asking the Court to pass an order withdrawing her consent to the adoption.* A guardian ad litem was appointed to represent the infant and he has reported recommending against the adoption *by reason of the lack of consent* of the mother. The Board of Public Welfare also filed a report *to the same effect.*" [Italics supplied]

[2] "This cause having come on to be heard upon the Motion to withdraw consent, filed by the natural mother, a minor, and upon the Petition and Answer, and after argument upon the motion, evidence was presented by Petitioners and by the natural mother, and it appearing to the Court from the evidence that *the Petitioners have satisfied all of the requirements of the Adoption Statute but that the natural mother, as a matter of law, has the right to withdraw her consent without cause,* and it appearing that the withdrawal of such consent eliminates one of the essential requirements of the Adoption Statute, and there being no extra-ordinary cause shown

tion of children, than in the case of contracts generally; and, specifically, we are told that in other jurisdictions, a majority of the cases recognize the power of a natural mother, by withdrawing her consent, to defeat the consummation of adoption. As all adoption proceedings are statutory in character,[3] the value of cases from other jurisdictions, for purposes of interpretation, depends upon identity or close similarity of statutory provisions.[4] Appellee dismisses this point with the statement: "Adoption statutes are all similar and all have consent as the essential element of the act." The essential superficiality of this statement is demonstrated by comparing the old and the new District of Columbia statutes. Both have consent as an element; but the old law says, concerning consent, merely: "If the judge shall find, upon the hearing of such petition, that the petitioner is a proper person to have custody of such child, *and that the parent or parents or guardian of such child have given their permission* for such adoption, he shall enter an order * * *."[5] [Italics supplied] The provisions of the new law concerning consent are set out in the margin.[6] They reflect, as do other provisions of the statute, a different public attitude toward adoption[7] and require interpretation on a more thorough basis than

for dispensing with such consent, it is accordingly, by the Court, this 2nd day of November, 1943 adjudged, that the motion for withdrawal of consent filed by the natural mother, a minor, be and the same is hereby granted; and it is further adjudged, *that, by reason of the failure of petitioners to show the consent of the natural mother,* the petition for adoption be, and the same is hereby, denied, no extraordinary cause having been shown for dispensing with such consent; * * *" [Italics supplied]

[3] Madden, Persons and Domestic Relations, (1931) 355, and authorities there cited.

[4] See Crawford, Statutory Construction (1940) §§ 234, 235, 236, 237.

[5] D.C.Code (1924) c. 6, § 395.

[6] D.C.Code (1940) § 16—201: "Jurisdiction is hereby conferred upon the District Court of the United States for the District of Columbia to hear and determine petitions and decrees of adoption of any adult or child (hereinafter called adoptee) with authority to make such rules, not inconsistent with this section and sections 16—202 to 16—207, as shall bring fully before the court for consideration the interests of the adoptee, the natural parents, the petitioner, and any other properly interested party. No petition shall be considered by the court unless petitioner's spouse joins in the petition or *consents* to the adoption. * * * The court shall thereupon, if the adoptee is under twenty-one years of age, issue a rule with copy of the petition attached, *which shall be served in such manner as the court shall therein direct, directed to all parties to the petition who do not appear and consent to* the adoption, and to the Board of Public Welfare * * *." [Italics supplied]; id. at § 16—202: "If adoptee is under twenty-one years of age, no decree of adoption shall be made unless the court shall find that the following persons have *con-*

*sented* to the adoption: Adoptee, if fourteen or more years of age; and the natural parents or adoptive parents by a previous adoption, if living. The *consent* of the father of an adoptee born out of wedlock shall not be necessary unless he has both acknowledged the adoptee and contributed voluntarily to its support. The *consent* of a parent who is a minor shall not be voidable because of that minority. If adoptee shall have attained the age of twenty-one years or over, the only *consents* which shall be required are those of such adoptee, and its spouse, if any. The *consent* of a natural parent, or parents, or adoptive parents by a previous adoption, may be *dispensed with* (1) where after such notice as the court shall direct it shall appear to the court that such person or persons can not be located; (2) where they have been permanently deprived of custody of the adoptee by court order; (3) where it shall appear to the court that they have abandoned the adoptee and voluntarily failed to contribute to his or her support for a period of at least one year next preceding the date of the filing of the petition; or (4) where investigation has shown to the satisfaction of the court extraordinary cause why such *consent* should be dispensed with." [Italics supplied]; id. at § 16—203: "After considering the petition, the *consents*, and such evidence as the parties and any other properly interested person may wish to present, the court may enter a final decree of adoption if it is satisfied (a) that adoptee is physically, mentally, and otherwise suitable for adoption by the petitioner; (b) that the petitioner is fit and able to give the adoptee a proper home and education; and (c) that the change will be for the best interests of the adoptee." [Italics supplied]

[7] See Pound, The Spirit of the Common Law (1921) 189: "Finally, recent legislation and judicial decision have changed the old attitude of the law with respect to

by reference to decisions of other jurisdictions having statutes similar to that which formerly prevailed in the District. Specifically, it does not appear that any case upon which appellee relies[8] interpreted a statute sufficiently like that of the District to give it even persuasive effect.

■ Appellants, relying upon the rule[9]—that "whenever Congress, in legislating for the District of Columbia, has borrowed from the statutes of a State provisions which had received in that State a known and settled construction before their enactment by Congress, that construction must be deemed to have been adopted by Congress together with the text which it expounded, and the provisions must be construed as they were understood at the time in the State."—urge upon us the binding character of the Massachusetts case, Wyness v. Crowley,[10] in which the Supreme Judicial Court of that State held a parent's consent could not be withdrawn after it had been submitted to the trial court—as in the present case—with the petition, "voluntarily with a full understanding of every fact necessary to such consent." In that case the court said: "To accede to the contention that such voluntary consent may be withdrawn would be equivalent to saying that parties may come to a court, deliberately give their assent to actions by the court in matters affecting their interests, and afterwards, at their will and pleasure, return to the court and undo what they did because on a future day they did not like it." We agree with this statement and think that Congress, in enacting the District statute, intended to prevent just such results as those denounced by the Massachusetts court. However, the two statutes are not identical. In fact, that of the District is even more compelling in its terms.

■■ The specific language of the District of Columbia statute upon which our decision turns reads as follows: "If adoptee is under twenty-one years of age, no decree of adoption shall be made unless the court shall find that the following persons *have consented to the adoption:* Adoptee, if fourteen or more years of age; and *the natural parents* or adoptive parents by a previous adoption, if living. The consent of the father of an adoptee born out of wedlock shall not be necessary unless he has both acknowledged the adoptee and contributed voluntarily to its support. *The consent of a parent who is a minor shall not be voidable because of that minority."* [Italics supplied] In interpreting this language the trial judge concluded that consent of the natural mother accompanying the petition was not sufficient; that in order to satisfy the law she must be actually, presently consenting at the time of the hearing and, presumably, until the final order of adoption has been entered. That, however, is not what the statute says. It speaks, instead, in the perfect tense—"unless the court shall find that the following persons *have consented* to the adoption"—in other words, it speaks of an act completed. But, even assuming that the statutory language is susceptible of more than one interpretation, the final answer depends upon the legislative intent at the time the words were written into the statute. In our opinion, Congress intended that consent of a parent once given and acted upon should not be withdrawn without cause. This intention is clearly indicated by the final sentence of the statutory language quoted and italicized above: "The consent of a parent who is a minor shall not be voidable because of that minority."

Looking ahead to the administration of the new law Congress could see the probability of changes of mind; especially as the mother's decision to keep or give up

---

dependent members of the household. Courts no longer make the natural rights of parents with respect to children the chief basis of their decisions. The individual interest of parents which used to be the one thing regarded has come to be almost the last thing regarded as compared with the interest of the child and the interest of society. In other words, here also social interests are now chiefly regarded."

[8] In re White's Adoption, 300 Mich. 378, 1 N.W.2d 579, 138 A.L.R. 1034; In re Cohen's Adoption, 155 Misc. 202, 279 N.Y. S. 427; State ex rel. Platzer v. Beardsley, 149 Minn. 435, 183 N.W. 956; In re Nelms, 153 Wash. 242, 279 P. 748; Fitts v. Carpenter, Tex.Civ.App., 124 S.W.2d 420; French v. Catholic Community League, 69 Ohio App. 442, 44 N.E.2d 113, 115.

[9] Capital Traction Co. v. Hof, 174 U.S. 1, 23, 36, 19 S.Ct. 580, 594, 43 L.Ed. 873, affirming, 10 App.D.C. 205; Hartford Accident & Indemnity Co. v. Hoage, 66 App. D.C. 154, 85 F.2d 411.

[10] 292 Mass. 461, 464, 198 N.E. 758, 759. See 2 Mass.Gen.Laws (Tercentenary Ed. 1932) c. 210, p. 2647.

her infant would be influenced by deep-seated biological urges and psychological instincts and emotions. It could assume the intervention of kinsfolk and friends who would seek to change the mind and purpose of the natural mother according to their respective ideas of rightness and propriety. It could vision the bringing in of professional people and experts—doctors of medicine, clerics, lawyers, social workers—who might scrutinize the law to determine strengths and weaknesses. Congress apparently assumed, as it had a right to assume, that statutory provision for a promise made, or consent given, voluntarily, and acted upon by innocent persons, would insure protection for the interests of all concerned.[11] It knew that well established principles of contract,[12] waiver,[13] and equitable estoppel[14] would, ordinarily, prevent capricious and arbitrary evasion of a promise made, of consent given, of representations acted upon.

But Congress also knew that the law has from time immemorial and with great leniency relieved minors of responsibility for many acts and omissions, in order to prevent exploitation of them and their interests, which might otherwise result from their inexperience.[15] It realized that when all other methods failed and all other avenues of escape were closed, a distraught mother might fall back upon this defense of minority. Then, balancing all the conflicting considerations of public policy and private interest, Congress decided that the interests of the infant were of even greater importance than those of the girl-mother. It recognized her privilege of keeping her child even under the harassing burden of illegitimacy, but it provided that once she had relinquished it and had voluntarily consented to its adoption, her consent could not be voided because of minority.

It is inconceivable that Congress—with prevision of such efforts to avoid parental consent and while forbidding, specifically, a method of avoidance favored in the law above all others—could possibly, at the same time, have contemplated *unrestricted withdrawal of consent without cause or reason of any kind.* Instead, it is apparent that, in this respect—as well as in those provisions of the statute which make unnecessary the consent of parents who have abandoned their children, or who have absconded, or have been deprived of custody, or otherwise have revealed their unwillingness to measure up to parental responsibility—Congress has with deliberation and finality closed the door against changes of mind. It has restored to the court in this instance, as in others during recent years, its old power, as *parens patriae,*[16] to diagnose the case of the unfortunate infant and prescribe a course of treatment for its future; unhampered by the changing winds of emotion which alternately submerge and restore parental attributes.

It would be possible, therefore, to decide this case upon the single issue selected by the trial judge. But as the case must go back for redetermination, and as other questions presented on this appeal are vital in the future administration of the statute, we would be derelict in our duty if we failed to consider its larger implications, and to speak of those other issues. In doing so the legislative intent becomes even more clearly revealed by consideration, both, of the provisions of the Act and of its legislative history. In enacting this new law Congress was not acting blindly or arbi-

---

[11] In the case of French v. Catholic Community League, 69 Ohio App. 442, 44 N.E.2d 113, 115, one of the authorities upon which appellee relies, the court limited the right of withdrawal of consent to a situation in which the mother had not been advised of the acceptance of her consent and it had not yet been acted upon by the adoptive parents.

[12] 1 Restatement, Contracts (1932) § 90; 1 Williston, Contracts (rev'd ed. 1936) § 140.

[13] Mitchell v. Kemp & Burpee Mfg. Co., 3 Cir., 218 F. 843, 846; Champion Spark Plug Co. v. Automobile Sundries Co., 2 Cir., 273 F. 74, 79; G. S. Johnson Co. v. Nevada Packard Mines Co., D.C.Nev., 272 F. 291, 305, 306. See Globe Indemnity Co. v. Cohen, 3 Cir., 106 F.2d 687, 691.

[14] 2 Pomeroy, Equity Jurisprudence (4th ed. 1918) § 805; United States for Use and Benefit of Noland Co., Inc. v. Wood, 4 Cir., 99 F.2d 80; Burlington Sav. Bank v. Rockwell, 9 Cir., 31 F.2d 27, 29; Ralston Purina Co. v. United States, 58 F.2d 1065, 1068, 75 Ct.Cl. 525.

[15] See Madden, Persons and Domestic Relations (1931) 526 et seq.

[16] United States v. Murray, 275 U.S. 347, 48 S.Ct. 146, 72 L.Ed. 309 (probation); Ex parte Newkosky, 94 N.J.L. 314, 116 A. 716 (parens patriae); 38 Col.L. Rev. 1318 (federal juvenile court law). See D.C.Code (1940) § 11—901 et seq.; 18 U.S.C.A. §§ 724 and 924.

trarily, but, instead, upon the advice of trained persons[17] who have studied these problems of child life and family welfare.[18] We are warned, by such well-known authorities as J. Edgar Hoover, of the menacing increase in juvenile delinquency and crime. This threat to public order and private life has its roots, largely, in the undisciplined, neglected and abandoned children who constitute an unexpected byproduct of our complex civilization.[19] Gradually, we have begun to learn that repressive criminal laws, alone, are insufficient for our protection. Even the more modern methods provided by juvenile courts and probation can give only ameliorative relief. Gradually, we are coming to understand that our efforts must go far back into the lives of these children in order that they may be restored, so far as possible, to the influences of normal homes and family life.[20] The disciplines, the affections, the achievements, and the sense of security and belonging, which are possible only with such a background, are of the essence in training for participation in modern life. Obviously, the problem and the need for remedial action is greater in the case of illegitimate children than of others. The child who, from its first awkward years, has been excluded from normal friendships and associations, who has

[17] H. R. Rep. No. 1274, 75th Cong., 1st Sess. 1–3: "The measure here presented establishes a method of adoption proceedings which is in accord with modern thought based on years of experience by welfare workers and child placement agencies. * * * This bill has the endorsement of the following listed organizations:

| | |
|---|---|
| Juvenile Protective Association | Washington Child Guidance Clinic |
| Twentieth Century Club | Travelers Aid Society |
| Bureau of Rehabilitation | Monday Evening Club |
| St. John's Orphanage | St. Anne's Infant Asylum |
| Jewish Social Service Agency | Council of Jewish Women |
| Florence Crittenton Home | Social Hygiene Society |
| League of Women Voters | Board of Public Welfare |
| Bar Association | Institute for Mental Hygiene |

A hearing was held by the committee and it was aided in its discussion and consideration of the bill by the following representatives of organizations experienced in dealing with problems concerning child welfare: Miss Mildred Terrett, executive secretary, Juvenile Protective Association. Prof. H. G. Spaulding, legal department, George Washington University. Miss Mary R. Coldby, Children's Bureau, Department of Labor. Mr. B. W. Weaver, District Bar Association. Mrs. Ernest Gruening, chairman, Child Welfare Committee, Council of Social Agencies. Mrs. Louis Ottenberg, League of Women Voters. Draft of this bill was prepared by the Commissioners of the District of Columbia and a copy of their letter submitting same is hereto appended and made a part hereof: * * * This proposed legislation is designed and intended to protect the adoptive parents as well as the adopted child and suggests safeguards which it is believed will accomplish the same. This bill is sponsored by the Juvenile Protective Association of the District of Columbia and has its hearty and unanimous endorsement. A special committee of the Bar Association of the District of Columbia has considered and studied this bill and is unanimously in accord with the principles of the same although it suggests several changes of minor importance which could be heard in committee. The Commissioners of the District of Columbia endorse this proposed legislation and are of opinion that its passage is desirable. * * * Very respectfully, M. C. HAZEN, *President, Board of Commissioners*, District of Columbia."

[18] See Parmelee v. United States, 72 App.D.C. 203, 209, 211, 113 F.2d 729, 735, 737.

[19] Hoffman, Children and Crime, Proceedings of the Attorney General's Conference on Crime (1934) 34–36; Lenroot, Old and New Methods of Dealing with Vagrants and Delinquents, id. at 442–446; National Commission on Law Observance and Enforcement, Report on Causes of Crime (1931) Vol. 1, 62–81.

[20] This understanding is reflected in the newly enacted law to regulate the placing of children in family homes, the first section of which reads as follows: "That the purpose of this Act is to secure for each child under sixteen years of age who is placed in a family home, other than his own or that of a relative within the third degree, such care and guidance as will serve the child's welfare and the best interests of the District of Columbia; and to secure for him custody and care as near as possible to that which should have been given him by his parents." Pub. L. No. 292, 78th Cong., 2d Sess. (April 22, 1944). See Haas, Man and Society (1930) c. VII, The Functions of the Family; Clarke, Discipline in the Home, 8 Federal Probation No. 2, p. 5.

known the disapproval of the unco guid,[21] develops, first, a complex of fear and frustration, followed by resentment against the dominant group in organized society which permits such treatment. The illegitimate child is the visible evidence of transgression against religious and moral standards. Our forebears used to destroy inanimate objects which chanced to be agents of misadventure, or forfeit them as deodands. Similarly, these unfortunate offspring of romantic intemperance have been made whipping boys for vicarious repentance.[22] As infants they have died in far greater proportion than their legitimate brothers and sisters; those who survived have worn the scarlet brand.[23] It goes without saying that such people are more apt to become a burden upon organized society than cooperating members of it.[24] The large percentage of illegitimate births in the general total is unknown to most people, and is startling in its potentialities.[25]

It was with all these considerations in mind that Congress repealed the old statute and enacted a new one for the District of Columbia, carefully designed to protect adoptive parents as well as the adopted child; to close the records against inspection in order to avoid future embarrassment and humiliation; to make available the services of the Board of Public Welfare, or other qualified agencies, to assist the court in its determination; to empower the court to make appropriate rules which will bring fully before it the interests of all proper parties; and, if necessary, to retain control of the case through entry of an interlocutory decree, which, in turn, may be set aside for cause shown. It is apparent that if in particular cases the unstable whims and fancies of natural mothers were permitted, first, to put in motion all the flow of parental love and expenditure of time, energy and money which is involved in adoption, and then, as casually, put the whole process in reverse, the major purpose of the statute would be largely defeated. Doctors of medicine and of divinity, potential adoptive parents and social workers would be stymied in their rehabilitative efforts. A premium would, instead, be put upon the emotional instability which produces illegitimates; to say nothing of the possibilities for racketeering which such an interpretation of the law would put in reach of those who may be criminal in their tendencies as well as lacking in the qualities of parenthood. The new law cannot prevent illegitimacy or remove its stigma, generally,[26] but to the extent that it may secure desirable placement of even a few illegitimate children it may avoid some of its most dangerous results. But to do so it is necessary that such chil-

---

[21] Robert Burns, Address to the Unco Guid, or The Rigidly Righteous.

[22] Davis, Illegitimacy and the Social Structure, 45 Am. J. of Soc. 215–233.

[23] Harvey, Out of Wedlock, 128 American Magazine (October, 1939) 20.

[24] Mangold, Children Born Out of Wedlock (1921) 131: "Sigmund Engel, in discussing criminality among persons of illegitimate parentage says, 'there is not a single civilized country in which we fail to find that the average criminality rate of illegitimate children is considerably higher than the average criminality rate of the legitimate.' He says further that this difference applies to the number of offenses committed per person and to each punishable offense; also that among recidivists the influence is particularly marked."

[25] Furfey, Social Problems of Childhood (1929) c. VI, The Bar Sinister. See Bureau of Census, Statistical Abstract of the United States (1940) 92, 93:

"No 89.—BIRTHS AND STILLBIRTHS, BY LEGITIMACY, BY STATES: 1938

| | Live Births | | | Stillbirths | | | Stillbirths per 100 Live Births | | |
| Area | Total | Legitimate | Illegitimate | Total | Legitimate | Illegitimate | Total | Legitimate | Illegitimate |
|---|---|---|---|---|---|---|---|---|---|
| United States 1 | 1,813,141 | 1,738,679 | 74,462 | 58,387 | 53,127 | 5,260 | 3.2 | 3.1 | 7.1 |
| White | 1,562,344 | 1,530,301 | 32,043 | 43,089 | 41,434 | 1,655 | 2.8 | 2.7 | 5.2 |
| Other races | 250,797 | 208,378 | 42,419 | 15,298 | 11,693 | 3,605 | 6.1 | 5.6 | 8.5 |

[26] For other phases of the problem, see Strahorn, A Lawyer's View of Vital Statistics, 27 Am. J. of Public Health 1207, 1214; Fisher, The Unmarried Mother and her Child, 156 Contemporary Rev. 485.

---

1 Exclusive of California, Massachusetts, New York, and Texas, which do not require a statement of legitimacy of child."

dren and their adoptive parents be protected against possibilities of the kind suggested. Especially in the adoption of illegitimate children it is desirable that the break between infant and consenting mother be abrupt and final. The number of children who are housed in asylums or boarded out at the expense of the public is evidence enough of the problem and of the need.[27] These are the considerations which must be kept in mind in interpreting and administering this law.

It is urged on behalf of the natural mother, and in support of her attempt to withdraw her consent, that the putative father of the child has committed suicide and thus removed the major obstacle to the happy future of mother and child. On the contrary, his death has removed one of the main arguments of those who urge, as a matter of public policy, that an illegitimate child should be retained, at all odds, by the natural mother.[28] It is doubtful in most cases—if there is any reasonable alternative—whether such a child should be used as a means of coercing a recalcitrant father into marriage, on the chance that a normal family will result. But under the circumstances of the present case that chance has gone and this child, restored to its mother, would live as an illegitimate, if the mother remained unmarried; indeed as a serious handicap to her marriage.

■■ Stress was placed—on oral argument as well as in the brief—upon the illness of the natural mother following the birth of her child and the fact that she acknowledged execution of the consent the day after the birth. It should be noted in this connection that the consent was originally signed two months prior to the birth of the child; that the mother, herself, sought the advice of her family physician; that she and her parents considered the matter for some time prior to her execution of the consent and that her parents joined in its execution. The contention, therefore, that the consent was not voluntarily given or was without knowledge of its consequences is without merit. It was fully sufficient to satisfy the requirements of the statute and was not subject to withdrawal; especially after having been presented to the court and acted upon by appellants who were—it is conceded—innocent strangers who acted in perfect good faith and in full compliance with the statute at all times.

■■ Appellee contends that in deciding this appeal we should weigh heavily

---

[27] Information supplied by the Board of Public Welfare of the District of Columbia:

the mere innocence of a party does not always obviate freedom from suffering. The attitude which must finally prevail is one

"Wards on Expense of Board of Public Welfare
Daily Average

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Fiscal Year 1943** | | | | **Fiscal Year 1944** | | | | |
| Average | 974 | | | Average 10 months | 951 | | | |
| July 1942 | 997 | January 1943 | 968 | July 1943 | 960 | December 1943 | 951 | |
| August | 986 | February | 971 | August | 946 | January 1944 | 943 | |
| September | 986 | March | 955 | September | 951 | February | 946 | |
| October | 984 | April | 953 | October | 960 | March | 946 | |
| November | 967 | May | 971 | November | 957 | April | 949" | |
| December | 963 | June | 981 | | | | | |

See Pub. L. No. 292, 78th Cong., 2d Sess. (April 22, 1944); Pub. L. No. 340, 78th Cong., 2d Sess. (June 14, 1944).

[28] Mangold, Children Born Out of Wedlock (1921) 92-93: "Much of our legislation past and present is based on the theory that the child is the pivot around which circle the other interested parties; and there is no doubt that the mother can be best reclaimed by using the child as means of reformation and that the chief way to reach the father is through the child. While father and mother are individuals inclined to independence, the baby is the foundation of a family and holds parents together. * * * Again, while our sympathy is with the child and we hope that he may not suffer unnecessarily, still

which harmonizes best with the advancement of our social and moral welfare. It is to be hoped that innocence will not have to suffer in order to accomplish the highest good, but if it does, then this sacrifice must be borne and the illegitimate child suffer in order that future generations will become more moral and illegitimacy be wiped out. This consummation would represent only one of the many vicarious sacrifices now undergone to accelerate our social progress."; Lundberg, Children of Illegitimate Birth, Children's Bureau Pub. No. 166, 16–20.

two facts, i.e., that the trained social workers in the Board of Public Welfare recommended against the adoption; that the extremely competent guardian ad litem, appointed to represent the interests of the infant, recommends against adoption. For two reasons appellee's contention is unsound. In the first place, both recommendations were made upon the assumption that the natural mother, as a matter of law, rightfully withdrew her consent; hence, that appellants had failed to satisfy the requirements of the law. In the second place, it is the function of the District Court, not of this court, to determine the best interests of the infant. This is the primary duty with which it is charged when petitions for adoption are presented for its consideration. Its judgment, from which this appeal was taken, on the contrary, is grounded, solely, upon the issue of consent. In all other respects, the judgment states, appellants have satisfied the requirements of the statute. In its opinion the court says petitioners have become warmly attached to the infant, that it would be well taken care of by them, and if the order of adoption were made the illegitimacy of the child would, probably, not be known. Apart from the jurisdictional hurdle which the court thought stood in its way, the opinion and judgment indicate pretty clearly that the best interests of the infant would be served by adoption. However, until the trial court exercises its discretion upon that point, it is an open question—certainly not one for this court to decide.

When the case is remanded the trial court will require new reports from the guardian and from the Board of Public Welfare, together with such other information and advice as may be available. Evidence of this character is just as necessary and just as admissible in the present case as is opinion evidence upon any other issue triable in a court of law. This is exactly the kind of evidence which is contemplated by the statute. It is the same type of evidence as is used in hearings to determine whether probation shall be granted and in the determination of many similar issues.

The case will be remanded with instructions to proceed in conformity with this opinion.

Reversed.