### HAMMOND et ux. v. CHADWICK et ux.
### No. 2697.

Court of Civil Appeals of Texas. Waco.
Dec. 12, 1946.

Rehearing Denied Feb. 13, 1947.

548

G. H. Crane, of Dallas, for appellants.

McNees & McNees, Frank G. Harmon and Nita Karl Ott Harmon, all of Dallas, for appellees.

LESTER, Chief Justice.

This is a proceeding instituted by the appellees, C. N. Chadwick and wife, to adopt a minor.

The evidence shows that the mother of the child was married but that her husband was overseas in the Air Corps when she became pregnant; that Mrs. Chadwick and her friend, Mrs. Harrison, learning of the coming event, went over to see the expectant mother with the view of seeing if she would give the baby to Mrs. Chadwick when it was born; that they invited the mother to go with them for a ride, whereupon they brought up the subject of the baby and during the conversation the mother promised to give the child to Mrs. Chadwick, the husband at that time still being overseas. After the ride Mrs. Chadwick took the mother to the doctor two or three times and took her to the hospital once or twice prior to the birth of the baby, which occurred on July 1, 1945. In February 1945, the mother wrote her husband concerning her condition and expressed to him a willingness to give the child away. He replied that it would probably be best to give the child away. He returned about a month prior to the birth of the baby but he did not visit the hospital during the five days she was there. He claimed that he was somewhat shocked over the incident and at the time he and his wife signed the instrument evidencing their consent to the adoption he thought it best to give the baby away. On the 5th of July the mother was taken home and Mrs. Chadwick took the baby to her home, then on the same day went with her lawyer to the home of the mother, where the consent agreement was signed by the mother and her husband.

Mrs. Chadwick thereupon gave to the mother the sum of $55, representing the amount of her hospital bill.

The petition for adoption was filed the next morning, July 6, at 10:35. The court appointed an investigator and set the date for hearing on the petition for July 17th. On said date the Chadwicks appeared in court with their attorney, but the court was not willing to enter an order granting the adoption on July 17th but required them to wait until the child had remained in the home of the Chadwicks for a period of six months.

Within a very short time after the petition for adoption was filed, the mother began to want the return of her baby, and on the 18th day of September, 1945, filed in court, through her attorney, an answer, wherein she set up that she objected to the adoption of her infant son by relators, or either of them, or by any person. She also filed her second and third amended answers, in each of which she was joined by her husband.

The court tried the case twice, the second time on May 14, 1946, and entered judgment granting the adoption to appellees.

Appellants appeal on one proposition, and that is that appellants, and each of them, had a legal right to repudiate and disaffirm their waiver of or consent to the adoption at any time before a final judgment of the court for adoption, and that any judgment granted for the adoption of any minor over the protest of its parents is null and void and of no effect and not binding on the parents.

There are two lines of authorities, one holding that consent, freely given, may be arbitrarily withdrawn at any time before the court enters its final judgment in the proceeding; the other holding that consent, freely given, cannot arbitrarily be withdrawn after the jurisdiction of the court attaches. Some of the authorities supporting the former view are: 2 C.J.S., Adoption of Children, § 21, p. 386, which states: "Consent may be withdrawn at any time before adoption, even though given in writing, and accompanied by transfer of the custody of the child, and even though the natural parent had abandoned the child;

and an adoption based upon a consent that has been withdrawn is void." In re White's Adoption, reported in 300 Mich. 378, 1 N. W.2d 579, 138 A.L.R. 1034; Nelms v. Birkland, 153 Wash. 242, 279 P. 748; In re Anderson (Dwinnell et ux. v. Fallon et al.), 189 Minn. 85, 248 N.W. 657; Fitts v. Carpenter, Tex.Civ.App., 124 S.W.2d 420.

Some of the authorities supporting the later view are: In re Adoption of a Minor, 79 U.S.App.D.C. 191, 144 F.2d 644, 156 A. L.R. 1001; Lee v. Thomas, 297 Ky. 858, 181 S.W.2d 457; Wyness v. Crowley, 292 Mass. 461, 462, 198 N.E. 758.

Article 46a of Vernon's Texas Civil Statutes provides the only method for adoption, and reads as follows: "Except as otherwise amended in this Section, no adoption shall be permitted except with the written consent of the living parents of the child; provided, however, that if a living parent or parents shall voluntarily abandon and desert a child sought to be adopted, for a period of two(2) years, and shall have left such child to the care, custody, control and management of other persons, and such parent or parents so abandoning and deserting such child shall not have contributed to the support of such child during such period of two(2) years, then in such event it shall not be necessary to obtain the written consent of the living parent or parents in such default, and in such cases adoption shall be permitted on the written consent of the Judge of the Juvenile Court of the county of such child's residence, or if there be no Juvenile Court, then on the written consent of the Judge of the County Court of the county of such child's residence." Also providing that consent shall not be required of parents whose parental rights have been terminated by order of the Juvenile Court or other court of competent jurisdiction.

Section 3 of the foregoing article provides that "no petition for adoption of any minor child shall be granted until the child shall have lived for six months in the home of the petitioner; provided, that this requirement may be dispensed with upon good cause shown in the discretion of the Court, when the Court is satisfied that the home of the petitioner and the child are suited to each other."

In reference to the requirement that the child shall reside in the home of the petitioner for six months prior to the order of adoption, it is held in the case of In re Cohen's 'Adoption, reported in 155 Misc. 202, 279 N.Y.S. 427, points 7 and 8 on p. 434:

"Among the 'requisites of voluntary adoption' enumerated in section 112 of the Domestic Relations Law, is the following: '3. Where the child to be adopted is under sixteen years of age, the petition must show that the child to be adopted resided continuously with the foster parents, at least six months prior to the date of petition. * *'

"The purpose of this addition, which was made by chapter 323 of the Laws of 1924 (section 3), was to prevent unduly precipitate action in the serious matter of establishing new relationships and severing those of blood and natural affection. Any authority having contacts with such matters is familiar with the frequently untoward results which eventuated from inconsidered action of this variety. The object sought was to give a reasonable time for reflection to the parties affected, to the end that the act of adoption, if finally consummated, would be the result of considered judgment and not of impulse or temporary pressure. It enables the persons who are contemplating the addition of a permanent member to their family to obtain a practical demonstration in miniature of the result, and likewise permits the natural parents of the person to be adopted to weigh the effect of the act which will render them utter strangers to their own flesh and blood, to the end that the previously not uncommon exhibitions of the parental instinct, resulting in kidnappings of their legally lost offspring and other like heart-rending episodes, may be avoided.

"The taking of a child for adoption imposes no obligation in rem, if such phrase is permissible, in respect to the person the adoption of whom is contemplated. A breach of contract might conceivably result if an agreement for prospective adoption had been made, but this could be com-

pensated only in damages, since public policy would not permit its enforcement by suit for specific performance. On grounds of mutuality and for similar reasons of public policy, a like obligation is all which should be enforceable against the natural parent, otherwise the beneficient provisions of the statute providing for opportunity for ample reflection would be nullified."

We do not here pass upon the question of whether or not in all cases consent, previously given, can be arbitrarily repudiated and disaffirmed at any time after the jurisdiction of the court has attached and before the final order of the court in such proceeding. As we construe the greater weight of the authorities, the question of whether consent, previously given, can be withdrawn, must be determined from the facts of the particular case. In the case of Wyness v. Crowley, 292 Mass. 461, 462, 198 N.E. 758, cited by appellee, the mother of the child permitted it to remain in the possession of the foster parents for more than fifteen months before seeking its return. In the case of Lee v. Thomas, 297 Ky. 858, 181 S.W.2d 457, also cited by appellee, the natural mother of the child permitted the foster parents to have possession of the child for fifteen months without any objection on her part and the foster parents had expended approximately $2,500 in extra preparation for taking care of said child. In the case of In re Adoption of a Minor, reported in 79 U.S.App.D.C. 191, 144 F.2d 644, 647, 156 A.L.R. 1001, also cited by appellees, the court held that it was the intention of Congress in passing the adoption act for the District of Columbia to prevent parents from withdrawing their consent after once given, as evidenced by the act itself, wherein it is provided: "The consent of a parent who is a minor shall not be voidable because of that minority." The fact that the child had remained in the care and custody of the foster parents for approximately one and a half years, and the foster parents had expended large sums of money in making preparation and in taking care of the minor without any objection on the part of the natural parents, was a deciding factor of the court in holding that the natural parents should not be permitted to withdraw their consent previously given. But we do not find those conditions existing in this case. We find the natural parents seeking the return of their child shortly after the execution of the consent agreement and long before the foster parents had expended any considerable amount of money, and almost all of the expense the Chadwicks had been put to has been incurred since they knew the mother wanted the return of her baby. Mrs. Chadwick testified in answer to the following interrogatory propounded to her by her attorney:

"Q. Now, when did you first find out that she wanted to take the baby back? A. Well, it was quite a bit later there, but the things that happened in between were what made me think she was going to try to take it."

She testified that the things she had reference to transpired during the month of September, 1945. We hold that in view of all the facts of this case, that appellants had a right to repudiate and disaffirm their alleged consent previously given, as they did shortly after the execution of the instrument and before the court entered its final judgment in the matter, and before the appellees had the care and custody of said child for any considerable length of time and before they had expended but very little money in supporting and maintaining it.

Under appellees' contention in this case, after petition for adoption is filed and an investigator appointed by the court, no one is bound by such proceedings except the mother who brought the child into the world. No court in this land would enforce an adoption agreement if, at the expiration of the six months and before the court entered the final order, the proposed adoptive parents informed the court that they no longer desired to adopt the child. Any one has a right to intervene in behalf of the child and show that the adoption should not be permitted. So appellees, in effect, say that since they beat the mother to the courthouse the next morning while she was sick in bed and unable to appear in her own behalf, she is therefore barred from withdrawing her consent at any time after the court has taken jurisdiction of the matter.

If we should be mistaken in holding that under the facts of this case the appellants had a right to repudiate and disaffirm their alleged consent previously given, we do not believe the evidence is as full and satisfactory as it should be, but is insufficient to show that the instrument executed by appellants evidencing their consent was freely executed on the part of the mother, for at the time she executed same she was laboring under a great mental strain and in fear that if she kept the child it would result in unhappiness to her family and cause a separation between herself and her husband, to which condition Mrs. Chadwick no doubt contributed to a large degree and helped to bring about. The mother gave the following testimony, which was not denied by Mrs. Chadwick: that she, Mrs. Chadwick, always told her that she had her little girl to think of; that by not keeping the child she wouldn't be talked about when she grew older and found out about it and that if she kept the baby there would always be a conflict between the two; that she would find out and cause trouble and "we wouldn't have a happy home." The mother further testified that she believed and relied upon said representations at the time she executed the instrument. The mother also testified that she never did voluntarily and of her own free will give her child away; that at one time she seemed to think it was best but she was so torn up she didn't know what to do; and in support of the above testimony given by the mother, Mrs. Chadwick testified, in answer to the following questions, when being interrogated as to whether or not she was in a hurry to get the papers signed:

"Q. Now, you were afraid that George and Ruth would change their minds all along. A. Well, she had changed her mind once and I thought she had the privilege.

"Q. Now, you grant that if she has changed her mind now and got her health restored and she and George are living happily together, you admit she has a right to change her mind, if she really has it made up this time. A. Well, she changed it so many times."

The foregoing testimony and the conduct of Mrs. Chadwick in connection with this matter, and the unchallenged testimony of the mother, thoroughly convinces us that the consent, if any, upon the part of the mother was not freely given, and that Mrs. Chadwick realized that the mother had not voluntarily consented to the adoption of her baby, and the evidence is not sufficient to establish that the consent of the mother was freely given. We find Mrs. Chadwick with her lawyer on the evening of the fifth day after the child was born and while the mother was in bed, getting the papers signed, and by 10:35 the next morning at the courthouse trying to put the adoption through while the mother no doubt was still confined to her bed. Mrs. Chadwick, knowing most if not all of the conditions surrounding the mother, took the baby, and for many months has refused to return it to its natural mother, thereby contributing in a large degree to the situation that now exists.

In this case the appellants certainly did not abandon their child for two years, but have been seeking its possession, with a willingness and desire on their part to support it. No court has found them unfit to rear or have possession of said child. Appellants have a little girl three years of age and the testimony shows that they are performing their parental duty in respect to her in a very efficient manner, consistent with the best interest and welfare of said child. The appellants are young people with most of their lives ahead of them. The husband graduated from high school and had two years in junior college. The mother belonged to and was a regular attendant of the church. They are able, ready and willing to rear said child, and the evidence is insufficient to establish that the best interest of said child would not be served by awarding it to its natural parents, but on the other hand, all the facts and circumstances show that it would be to the best interest and welfare of said child for it to be placed in the care and custody of its parents. Should the appellants at any time in the future become unfit to have the care and custody of said child, there is ample authority through the Juvenile Court to remove it from the care and custody of its parents and transfer it to others, but so long as the parents are proper persons to have

possession of the child, they should be permitted to perform the responsibility placed upon them by the law in rearing said child.

Therefore, this cause is reversed and judgment rendered for appellants.