**In re ADOPTION, William C. HECKER (Moss).**

**No. 25204.**

Kansas City Court of Appeals.

Missouri.

Dec. 1, 1969.

Frith & Pyatt, Robert C. Frith, Chillicothe, for appellant.

R. M. Gifford, Green City, for respondent.

MAUGHMER, Commissioner.

On February 1, 1968, Vella Lorraine Moss, filed in the Circuit Court of Sullivan County, Missouri, her petition for adoption of William Christopher Moss, a minor child. Attached to the petition was a copy of a written instrument captioned "Consent to Custody and Adoption" which had been

signed and acknowledged on February 19, 1966 by one Shari Lynn Hecker, who therein described herself as the mother of said child, declared that he was illegitimate and that his father was unknown. On July 20, 1968, the natural mother, as Shari Lynn Wyldes (she having on November 17, 1967, married one Robert Wyldes) filed her "Motion to Withdraw or Strike from the files 'Consent to Custody and Adoption'". Therein it was alleged that the said written consent instrument had not been freely given; that it had been executed by mistake, through duress, fraud, undue influence, had been induced by misrepresentations; that it did not conform to the requirements of law; that it was a consent to adoption by Vella Lorraine Moss and George W. Moss and not to either alone and that said instrument is void and illegal.

On October 23, 1968 a hearing was held. It was restricted solely to the issues presented by the motion to withdraw. All matters pertaining to the adoption itself were passed for possible later consideration. After all the evidence and testimony had been heard, and on November 18, 1968, the court entered the following finding and judgment:

"Motion to withdraw consent to custody and adoption sustained and by leave of Court said consent is withdrawn by movant."

Petitioner has duly appealed. The only question before us in this appeal is whether or not the trial court erred when in the exercise of its discretion, it decreed that movant be permitted to withdraw the surrender of custody and consent to adoption which she had executed on February 19, 1966.

In 1962, movant then carrying her maiden name of Shari Lynn Hecker and being 14 years of age and unmarried, became pregnant. Before the child was born, the petitioner Mrs. Moss, movant's mother Mrs. Mary Fisk, and movant herself engaged in some conversations exploring the possibility of Mr. and Mrs. Moss taking custody of and adopting the expected baby. Shortly before its birth movant and the supposed father intermarried and decided to keep the child. However it died a few hours after birth, thereby fixing its status forever. They had a second child, a little girl who was five years of age at the time of the hearing. However movant and this husband were divorced and at the time of the hearing she was residing in a trailer at Centerville, Iowa, with her second husband, Robert Wyldes, and her daughter, the second child. Mr. Wyldes was not the father of any of the children.

William Christopher Moss, the minor child involved in the present proceeding, is an illegitimate child. He was born at a hospital in Bloomfield, Iowa, on February 16, 1966, to movant when she was 18 years of age. On February 19, 1966, the child was removed from the hospital, and released to the actual custody of petitioner, Mrs. Vella Moss, where he has ever since remained. The evidence reveals that Mrs. Moss is the owner of more than 800 acres of farm land in Sullivan County, Missouri. She and her husband George W. Moss, were well-to-do farmers, lived in a modern home and had no children of their own. Mrs. Wyldes and her parents had known Mr. and Mrs. Moss for many years. In fact movant's father had at various times worked for Mrs. Moss's father.

Only three witnesses testified at the hearing on the motion to withdraw consent. These witnesses were the movant Mrs. Wyldes, her mother Mrs. Mary Fisk, and the petitioner Mrs. Vella Moss. Mr. George W. Moss, husband of the petitioner, and jointly named with her as a recipient of custody and consent to adopt, had died on December 10, 1967. Mrs. Moss said she had known the parties for many years, that Shari and Shari's mother had first dis-

cussed adoption when Shari was 14 years old and pregnant with her first child. She said that Shari and that child's father intermarried shortly before the expected date of birth and they decided to keep the baby. However it died a few hours after birth. Mrs. Moss testified that in the fall of 1965, Mary Fisk telephoned and asked that she meet Mrs. Fisk and Shari in Kirksville, Missouri; that such a meeting was held in the parking lot of Dr. Gross. Mrs. Moss said they both told her that "Shari was pregnant again and asked if I would take her baby." She said she told them she would talk with her husband. She stated that in December, 1965 she agreed to take the child, and in response to an inquiry as to whether or not adoption of the child was discussed, said:

> "Yes. The one thing that I talked to Mary and Shari both about was this very thing that is happening today. I said, 'Shari, what if you should get married sometime and the man could provide for the child. If I take the child I don't want any trouble through the Court because I intend to adopt it.' And she and Mary both agreed they wouldn't give me any trouble."

Mrs. Moss said that a lawyer in Iowa, whose name she did not recall, prepared the custody and consent to adopt document. The instrument is set forth in its entirety.

## "CONSENT TO CUSTODY AND ADOPTION

'STATE OF IOWA ⎫
DAVIS COUNTY ⎭ ss

'I, Shari Lynn Hecker, being duly sworn on oath, state that I am the mother of William Christopher Moss, born February 16, 1966 at 7:54 A. M. at the Davic County Hospital in Bloomfield, Iowa; that said child is illegitimate and the father of said child is unknown.

'I do hereby give and grant unto George W. Moss and Vella Lorraine Moss full care, custody and control of said child and hereby expressly waive all further notice and consent that said child be adopted by George W. Moss and Vella Lorraine Moss, and I hereby authorize and direct the Davis County Hospital at Bloomfield, Iowa to release and deliver said child to Vella Lorraine Moss.

'Dated at Bloomfield, Iowa this 19th day of February, 1966.

/s/ Shari Lynn Hecker
Shari Lynn Hecker

'STATE OF IOWA ⎫
DAVIS COUNTY ⎭ ss

'On this 19th day of February, 1966, before me, the undersigned, a notary public in and for said county in said state, personally appeared Shari Lynn Hecker, to me known to be the identical person named in and who executed the foregoing instrument, and acknowledged that she executed the same as her voluntary act and deed.

(Seal)

/s/ 'A. A. Anderson
Notary Public in and for said County.' "

———◆———

Mrs. Moss declared that during the period of almost three years while custody of the child had been with her, from the time he was four days old until nearly three years

old, she had developed much affection and strong ties and bonds for him. She expressed her belief that the child had responded, said he was in good health and seemed happy and contented.

All three witnesses agreed that on February 19, 1966, Shari and her mother took the baby from the hospital to the street where Mrs. Moss was waiting in her automobile; that the consent agreement was lying on the seat; that they all immediately drove to the residence of Mr. A. A. Anderson, a notary public, known to and selected by Shari and her mother; that Mrs. Moss and the baby remained in the automobile; that Shari and her mother took the written instrument inside, where Mr. Anderson asked Shari if anyone was "forcing her" to sign; that Shari said, "No" and signed. This event took place in Bloomfield, Iowa.

Movant in her testimony declared that she had not read the document, did not know its exact contents, but said it had been indicated to her it was to enable Mrs. Moss to take the child from Iowa to Missouri and not be subject to a charge of kidnapping. She stated however that the fact of her marriage in November, 1967, and the death of George Moss in December, 1967, caused her to try to get the child back and to oppose the proposed adoption. On cross-examination she admitted that from February, 1966 until the fall of 1968 she had frequently communicated with Mrs. Moss, both by telephone and by letter. She identified four letters which she had written. These were received into evidence. We give the dates and quotations therefrom:

June 3, 1966, "I do want to thank you for giving little Chris the life he should have."

May 12, 1967, "was wondering if you had a picture or two you could spare, I realize that's all the closer I'll be to little Chris."

On January 3, 1968, she stated in a letter to Mrs. Moss:

'I suppose you and Chris are getting along fine. I wish you would let me know when you adopt Chris, I'd just like to know."

July 19, 1966, "Mrs. Moss, there is one thing I am glad of and that is that I know where he is, I know he is loved and taken care of."

In the letter of June 3, 1966, she also wrote,

"Give your son a big kiss and hug from us."

Among others, the following questions were propounded to Mrs. Wyldes and she gave these answers:

"Q. And at that time it was—who told Mrs. Moss you or your mother that the child was to be born and that you wanted to place the child with her?

"A. Oh, to my knowledge I think we both told parts of it. I am not sure but I think I did, I told her the baby was going to be born.

"Q. And you wanted her to take the child?

"A. If I so decided to do so at the time, yes.

"Q. And the arrangement would be that she would pay for the doctor and hospital bills?

"A. Yes.

"Q. And those arrangements were discussed?

"A. Yes."

It was admitted that Mrs. Moss paid all of the doctor and hospital bills.

Mrs. Mary Fisk, mother of movant, stated that in the fall of 1965 she telephoned Mrs. Moss and requested her to meet Shari and herself in Kirksville. She described the ensuing meeting which took place in the parking lot of Dr. Gross, said they "discussed the baby, the coming baby." She referred to the adoption discussion which these three held when Shari's first baby

was about due. She testified that in Dr. Gross' parking lot, with Shari present, she explained that she was ill, they were without adequate funds and were being hounded by the welfare agency. She said "Mrs. Moss was enthused and readily accepted the offer." She next saw Mrs. Moss in December, 1965 when she came to their home to "see how things were coming with respect to the baby." She described the events when the baby was taken from the hospital by herself and Shari; said she, Mrs. Moss and Shari with the baby drove to the home of Mr. Anderson, the notary public whom she and Shari had selected and knew, that Mrs. Moss and the child remained in the car while she and Shari went inside and Shari signed the paper. She did not see Shari read it but heard her tell the notary that nobody was forcing her to sign. In reply to an inquiry as to the contents of the document she said:

"Well, I know that the baby, Vella was to take the baby and have the privilege after a year of adoption or take him for adoption."

■ Adoption is purely a creature of statute and our courts strictly construe the adoption statutes where destruction of the parent-child relationship is involved. In re McKinzie, Mo.App., 275 S.W.2d 365. We set forth parts of two Missouri statutes: 453.040 "The consent of the adoption of a child is not required of

"(3) A parent of a child or the mother of a child born out of wedlock who has waived the necessity of his or her consent to a future adoption of the child;"

Sec. 453.050.

"(2) Any waiver mentioned in subdivision (3) of section 453.040," (set forth immediately above) "or the written consent to adoption by any parent, shall be valid and effectual even though such parent was under the age of twenty-one years at the time of the execution thereof, and any such waiver or consent shall be irrevocable without leave of the court

having jurisdiction of the child given at a hearing, notice of which has been given to all interested parties."

Section 453.030(3) V.A.M.S. provides generally that consents to adoption "shall be acknowledged as conveyances of real estate are required to be acknowledged under the laws of this state, or * * * shall be witnessed by the signatures of at least two adult persons * * *," but specifically exempts those persons enumerated in Section 453.040 supra, which includes the mother of a child born out of wedlock. However, the document involved here was acknowledged with all the formality required in a deed conveying real estate.

Examination of the Missouri adoption decisions prior to 1947, reveals that our courts held the consent to adopt must be a *continuing* consent rather than a final act and the parent could revoke, at least up until final adoption, for any reason he might deem sufficient or for no reason at all. However, in 1947 our legislature made such consents irrevocable, except "with leave of court". The opinion in Adoption of McKinzie, supra, traces this development. We quote, 1. c. 369, 370:

"The old rule, * * * has been that the consent of the parent as required by the statute is a *continuing* consent which must be in force and effect at the time the adoption decree is entered. * * *"

* * * * * *

"However, in recent years there has been a growing tendency to limit the right of revocation of consent by the natural parent, as held in Re Adoption of a Minor, 79 U.S.App.D.C. 191, 144 F.2d 644. The annotation at 156 A.L.R., p. 1011, expresses this view as follows: "'* * * it must now be said, in view of the later cases (arising, it will be noted, in jurisdictions other than those represented in the earlier annotation), that the trend of the more recent authority is toward the position that where a natural parent has freely and knowing-

ly given the requisite consent to the adoption of his or her child, and the proposed adoptive parents have acted upon such consent by bringing adoption proceedings, the consent is ordinarily binding upon the natural parent and cannot be arbitrarily withdrawn so as to bar the court from decreeing the adoption, particularly where, in reliance upon such consent, the proposed adoptive parents have taken the child into their custody and care for a substantial period of time, and bonds of affection, in the nature of a "vested right," have been forged between them and the child.' "

The McKinzie opinion discusses the reasoning found in examination of numerous opinions in which the whole subject was explored. The court commented, 1. c. 371:

"Practically all of the cases found in jurisdictions where there is no applicable revocation statute and which apply the 'modern' rule hold that the withdrawal or refusal to permit withdrawal rests in the sound discretion of the court. Some of them use the words 'for good cause shown.' The discussions usually base denial of revocation upon (1) principles of contract; (2) principles of estoppel or other equitable grounds; (3) public policy favoring the adoption of illegitimate children; (4) welfare of the child as apparent from the facts.

"In a great many of these cases, however, the question of right of withdrawal, or opposition of the parent, came at a hearing on the adoption petition itself and it is sometimes difficult to separate which of the items are considered by the court in denying the revocation and which are applied to the judgment decreeing the adoption. Some of them stress the fact that arbitrary, or too generous permission for, withdrawal of consent would lay the proposed adoptive parents open to uncertainties and possibility of blackmail. The revocation is frequently denied because the child has been taken into the home of the proposed adoptive parents and kept for such length of time that ties of affection have developed. * * *"

The Supreme Court of Missouri, in In Re Mayernik, 292 S.W.2d 562, 570, said it this way:

" * * * It has been written, however, that the trend of more recent authority is toward the position that where a natural parent has freely and knowingly given the requisite consent to the adoption, and the proposed adoptive parents have acted upon such consent by bringing adoption proceedings, the consent is ordinarily binding upon the natural parent and cannot be arbitrarily withdrawn so as to bar the court from decreeing the adoption, particularly where, in reliance upon such consent, the proposed adoptive parents have taken the child into their custody and care for a substantial period of time and bonds of affection have been forged between them and the child. * * *"

Again—In Re G. K. D., 332 S.W.2d 62, 69, our St. Louis Court of Appeals affirmed a refusal to permit revocation and generalizing the facts, said:

"In the case at bar, the evidence shows that the appellant, natural mother, had appeared voluntarily at the respondent's office on July 15, 1957; that between that time and the birth of the child on October 29, 1957, and also the signing of the consent on December 16, 1957, she had had sufficient time and opportunity to consider her circumstances and desires; * * *."

Also in this G.K.D. case the court quoted briefly from an Illinois case, In re Simaner's Petition, 16 Ill.App.2d 48, 147 N.E.2d 419, 1. c. 421. In both cases the unwed mother prior to adoption had married the natural father, who had not signed a consent. Both courts (Missouri and Illinois) ruled that the consent was sufficient when given and the consent of the natural father was not essential. As to the mother's

right to revoke, the Illinois court said the fact that the mother was mentally disturbed at the time of the child's birth and when she signed the consent, did not constitute duress. Our Missouri court approved this conclusion and also the following specific statement by Illinois:

"'* * * Her act was deliberate and undoubtedly, as she felt at the time, for the best interests of the child.'"

The Massachusetts Supreme Court in In Re Adoption of a Minor, 156 N.E.2d 801, 806, had before it a situation where the natural parents of the child were married after the child's birth and after the mother had consented in writing to the adoption. The court ruled the putative father's consent was not required and in a discussion as to the equities said:

"* * * See also Adoption of Morrison, 260 Wis. 50, 63–65, 49 N.W.2d 759, 51 N.W.2d 713, which discusses this problem. When a child is placed by its parent for adoption in a good family the inevitable consequence will be that firm bonds of affection and confidence will rapidly arise on both sides. The damage to the child, who cannot understand what is happening, from breaking these bonds is something which even competent psychiatrists may be unable to predict. In the absence of compelling statutory command, such a breach should not be permitted lightly at the request of either of the natural parents who had their chance to take care of the child themselves and who themselves have created the unfortunate situation. * *"

In the G.K.D. case and at page 70, the court referred to the fact that the child in question was not the first child of the unwed mother and said:

"* * * She had experienced motherhood before. * * * Thus she knew the responsibilities and duties of motherhood. She had enjoyed the opportunity of knowing the natural love and affection between mother and child. With all of her background, she could make up her own mind. * * *"

In the case before us, while the surrender of custody and consent to adopt was to both Mr. and Mrs. Moss, we believe that the death of Mr. Moss does not give movant the right to revoke. The question still is, Was there duress, coercion, fraud or other elements which would make the consent involuntary?

As in all types of cases involving minor children—their custody and upbringing—the courts consider first and basically the welfare and best interests of the child. For many years under our law the unwed mother, the wed mother, the parents could surrender custody and consent to adoption of their child and then for any reason they might deem to be sufficient, change their mind, renege on their relinquishment, at least until formal adoption, uproot the child from his new home and once more start his life with his natural parents who had once already failed, neglected or refused to care for and support him. Students and observers of such procedures, including doctors, psychiatrists, welfare agencies and workers, judges, courts, legislatures and laymen generally observed many unwholesome results following such practices. They saw injuries to the nervous and mental system of the child which led to physical wounds. The hurt to the proposed adopted parents who may have had the child for a year or more was noted. It was apparent that worthy possible adoptive parents were hesitant to take children into their homes with the ever-present threat of instant removal being existent. Seeds for blackmail and extortion were planted. But above all, the number of good adoptive homes were lessened and this was an additional handicap to the ever-increasing number of illegitimate, unwanted and abandoned little babies. The legislatures became interested, studied the matter, became informed and acted through legisla-

tion. The opportunity, privilege and responsibility of parenthood is not just an occasional duty and blessing. It must be accepted every day, every week, every month and every year. It must be worked at—it must not be neglected.

■ We have reviewed carefully the evidence, the testimony and the admitted facts. Applying the legal and equitable principles of contracts, estoppel, fraud, duress, the pertinent statutes, fairness and justice to the proposed adoptive parent and the welfare of the child, we can conclude only that it was error to permit movant to withdraw and revoke the written consent.

She was 18 years of age when she signed. It was not her first but her third child—the second conceived out of wedlock. She and her mother had discussed placing the first child with this very petitioner. Her own testimony and her own letters show clearly that she knew adoption was contemplated. She said she decided to oppose the adoption after she married her present husband in November, 1967 and after the death of Mr. Moss in December, 1967. This was almost two years after her surrender of the child. The petitioner, Mrs. Moss, has had the care and custody of Chris since he was four days old—for almost two years when movant decided to try to revoke her consent and oppose the adoption—for almost three years to the time the decree or judgment permitting revocation was entered. It is self-apparent and there is no evidence otherwise than that the child was in good health and well adjusted. Strong bonds of affection must have been forged during those three years. Should the child now suffer the shock of transplant and removal? Shall the accrued rights of the adoptive petitioner receive no consideration? Shall the courts announce that a parent may by written instrument duly executed surrender custody and consent to the adoption of her four-day-old son, acquiesce therein for almost three years, and then be permitted to renege and revoke on her agreement? When will she be estopped to change her mind? Shall we say to prospective adoptive parents—"This is the law." Are little children to be passed around every few months or every few years in accordance with the whims of a parent who gave him away when he was only a few days old? We cannot so conclude.

We understand that in this type of case while we review de novo we are admonished to give due deference to the trial chancellor especially on questions of credibility. Sec. 510.310 V.A.M.S., Rule 73.01 (d) V.A.M.R. We have done that, and we believe our conclusions may be reached on the testimony of movant herself plus the admitted facts. We are also told not to reverse unless the judgment is clearly erroneous.

To permit revocation of the consent given in this case would in our opinion dilute to disappearance the word "irrevocable" as used in the statute. We do not believe the legislature intended it to be so interpreted. We shall not so construe it.

The finding and judgment granting revocation of the document styled "Consent to Custody and Adoption" is set aside and reversed. The cause is remanded under direction to proceed with a hearing and determination of petitioner's petition to adopt.

SPERRY, C., not sitting.

PER CURIAM.

The foregoing opinion of MAUGHMER, C., is adopted as the opinion of the Court.

All concur.