## Lee v. Thomas et ux.

June 23, 1944.

Harry J. Luedeke for appellant.

H. G. Hightower, John H. Klette, and Andrew W. Clark (guardian ad litem) for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

This is an adoption procedure, filed in the Kenton County Court on October 13, 1942, by appellees, J. Walter Thomas and his wife, Edith Thomas, against appel-

lant, Edith Esther Lee, and her illegitimate boy child, John Milton Lee, the latter of whom was then about fifteen months old. The mother—to whom we shall hereafter refer to as such—resisted the adoption, but the court overruled her objections and entered an order sustaining the prayer of plaintiffs' petition. The mother appealed to the Kenton circuit court wherein the case was again heard, and that court approved the judgment of the county court sustaining the motion for adoption with the name of the infant child changed from John Milton Lee to John Milton Thomas. This appeal by the mother is from that judgment.

The governing statute for such procedure is contained in sections 405.140 to and including 405.990 of the Kentucky Revised Statutes. It is conceded that the provided practice of such an action was literally followed except, perhaps, as is insisted by counsel for the mother, that subsection 4 of section 405.170 was not complied with, but that contention will be answered later on in this opinion. The case does not differ from all other classes of litigation, in that each case should be determined on its own particular facts. The task of deciding such controversies is always a delicate one and sometimes unpleasant, but the rights of the parties concerned must be determined and settled howsoever great the displeasure in doing so may be.

The mother at the time of testifying was 31 years of age. Prior to 1940 she married one Lawrence Day from which union a male child was born, but following its birth and in 1940, the couple was divorced, the court giving to the mother the custody of the infant child. After the divorce, and possibly before then, the Days were living with the parents of Mrs. Day at some mining camp in Perry County in more or less squalid and limited quarters, there being a number of other occupants of the cabin home, and which created considerable crowding and corresponding discomfort.

The mother left her legitimate child after a period following the divorce and obtained work as a housemaid in or near Hyden, Leslie County, Kentucky. She also performed some services periodically, for which she received slight compensation, in a restaurant in Hyden. While she was so employed she met a Mr. Bowling to whom she surrendered herself and became pregnant by him. Some five months afterwards the progress of

her condition became such that she quit her job at Hyden and returned to the home of her parents and where, as we have stated, her legitimate child, then some three years of age, had its home. The same crowded condition still existed at that home and the mother became aware of the necessity of providing not only a suitable place for the birth of her prospective illegitimate child —it being practically impossible for it to be born at the home of her parents—but she also desired to keep the matter as much as possible a secret from other members of her family and from the public. At the same time she was practically penniless and did not have the means with which to make the necessary provisions, including the fees of the attending physician.

At this time (5 months following pregnancy) she applied to the Captain of a Salvation Army camp located at Hazard, the county seat of Perry County, whose name was then L. B. LeMaster, but who hás since married Walter Zvoda. Mrs. Zvoda in her testimony in this case stated that appellant laid the facts before her substantially as we have stated and requested that witness interest herself in solving the problem confronting the prospective mother, which witness cheerfully consented to do. She told the mother about the maintenance in the city of Louisville by the Salvation Army of a lying-in hospital and that she would get in contact with it, and would see what could be done. Accordingly, she learned that there would be a charge of $50 and she so informed appellant who promised to endeavor to raise the amount before the time for the birth, but later on appellant reported to her that she could not raise exceeding $40. Witness then notified the hospital in Louisville and received the answer that they could not take care of appellant at all because the institution was already filled. Immediately following that information the Salvation Army Captain contacted Mrs. F. C. Symonds, the wife of Dr. F. Campbell Symonds, who then lived in Hyden, Kentucky, and had been since February, 1938. Her husband was "Director of the Leslie County Parrish, under the board of missions of the Presbyterian Church," having three missions under his charge. His wife was an enthusiastic worker in assisting her husband in discharging his duties and particularly did she devote her attention to assisting and providing for prospective mothers situated as was appellant.

In the meantime separate conversations were had between appellant and the two witnesses to whom we have referred, as well as conversations where both of them were present and in all of them appellant positively stated to the two witnesses that she did not want her prospective child in her home with her legitimate child; that she was unable to care and provide for the prospective newcomer, and that she wanted them, in addition to assisting her in the manner above outlined, to seek a home for her illegitimate child after it was born, and for it to be adopted by the occupants thereof. Accordingly Mrs. Symonds made preparation with the Snyder Hospital in Hazard to take care of the mother during her lying-in period and likewise provided for all charges and fees to the hospital and for the physician, the amount of which was later paid by appellees. Some day or two before the birth of the child appellant and her mother appeared in Hazard and the former went to the Snyder Hospital followed by the birth of her child on August 20, 1941. Three or four days later the mother signed a written consent, duly notarized as required by statute, for the child to be adopted, as she had previously expressed as her wish long before the occasion of the child's birth. In the meantime Mrs. Symonds contacted a physician in Cincinnati with whom she was well acquainted and to whom she imparted the information that a child would soon appear whose mother desired that it be adopted by others. That physician was acquainted with plaintiffs, and appellees, J. Walter Thomas and wife, both of whom then and now reside in their own residence at 223 Henry Clay Avenue, South Hills, Covington, Kentucky. They were childless, having lost in infancy the only child born to them, and they were very desirous of adopting one.

Mrs. Symonds contacted the Thomases, and after the mother signed her consent in the hospital for the adoption Mrs. Symonds took the child and delivered its custody to the proposed foster parents, who immediately made all necessary preparations for its rearing and in providing for it everything necessary therefor as prescribed by Dr. J. Gay Van Dermark, a well known pediatrician with whom the Thomases were well acquainted. A professional nurse was employed for something like the six months following the delivery of the child to appellees, but thereafter a practical nurse was constantly employed for the performance of no

other duties than to look after and care for the child according to the written directions as given by Dr. Van Dermark. We will not attempt to enumerate the various provisions made by appellees for the comfort, enjoyment, health and other interests of the infant child that they proposed to adopt, except to say, according to the undisputed testimony, the extra preparations therefor cost the appellees in the neighborhood of $2,500.

Mr. Thomas has a position with and an interest in the East Kentucky Coal Sales Company operating in the city of Cincinnati, and Mrs. Thomas has a position of long standing as "Advertising Display Manager of the Jenny Company, and Assistant Merchandise Manager," which is a retail establishment in Cincinnati, doing a business of more than $1,000,000 annually. It is chiefly, if not entirely, owned by a Mr. Brown who, though married, has no children. The working hours of Mrs. Thomas are anywhere between 10 and 10:30 A. M. to 4 P. M., but her valuable service is so much prized by her employer that, according to her testimony, she could do practically as she pleased without losing her job.

Both Mr. and Mrs. Thomas receive much more compensation than what is sufficient to maintain them in comfortable conditions and they are, therefore, abundantly qualified financially to discharge the task of rearing the infant child in this case in a manner to develop him into a valuable and useful citizen, whilst it is equally certain that the mother is almost, if not certainly, wholly unable to perform that task.

After the mother recovered so that she could leave the hospital where her child was born, she went back to her parents' home but later obtained a position in some sort of war work located about twenty miles from Hamilton, Ohio. In Hamilton she and a companion occupy an apartment containing only two rooms located in somewhat abandoned part of the town, and which an investigator appointed by the court reported was very slovenly maintained and kept, but it is the place to which the mother proposes to carry and endeavor to raise—at least for the present—both her legitimate and illegitimate child. The mother denied, in a way, that she ever told Mrs. Symond or Mrs. Zvoda before the birth of her child, that she wanted it to be adopted by others, but the court found otherwise, and we think the testimony

abundantly sustained its finding on that factual issue. Such being the facts, the remaining question is to apply the law thereto.

As a general proposition parents have the primary and superior right to the custody of their offspring above that of all others, but the declared law has injected into such cases a factor of almost equal dignity as that of the right of the parents, and which is the welfare of the child afforded by the superior advantages that adopting parents are about to and can furnish it and of which it would be deprived if it remained with its natural parents. But no opinion of any court so far as we are aware approves the right in anyone to take away from natural parents the custody of their children *solely* upon the ground that the adopting parent is better prepared to provide superior advantages to the child which the natural parent for any cause might be unable to provide. But where that situation exists, and the parent has agreed that his or her child might be adopted and has executed such consent or offer in the manner pointed out by the statutory regulations of the particular jurisdiction which has been acted on by the proposed adopter, then such consent or agreement, in the absence of fraud or duress in its procurement, plus the vastly increased opportunities of the adopted child, creates a case where there is no alternative but to sustain the adoption applied for.

The latest case from this court on the subject is Skaggs v. Gannon, 293 Ky. 795, 170 S. W. 2d 12, 16, in which the question of the right of a mother of an illegitimate child to revoke her previously executed written consent for its adoption by others was involved, and we held under the facts of that case that her right to do so existed, as was also done in other prior domestic cases which are listed in the opinion in that case. However, we said therein that: ''We are not inclined to go to the length of saying that withdrawal (of written consent) may be arbitrary, but are convinced that where sufficient reason is shown there may be a revocation before final judgment.'' Here appellees, in reliance on appellant's written consent, not only took custody of the involved infant, but also devoted time and money in preparations for carrying out their duty as foster parents for 15 months without any objections communicated to them by the mother of the infant. Even if fraud or

duress in obtaining the consent of the parents was available to repudiate the consent before final judgment in the adoption proceedings, such defense, if any, cannot prevail here because there is no testimony whatever in support of fraud, duress or any other avoiding ground for such repudiation.

Long before the infant was born—clear up to the day when it was taken away from the hospital—the mother had declared her desire, intent and purpose that her future born should find its home under our adopting statutes. It is true that she testified that she did not know who the adopting parents were, but according to her own testimony there was great delay on her part to obtain that information from either of the ladies to whom she gave authority to make or procure the adoption. But her want of information in that respect can be given no defensive effect to the adopting petition, it bearing only on her acquiescence in the arrangements made pursuant to her request and which she approved in her written consent for the adoption. Therefore, if the circumstances were different from what they are then appellant, the mother, under the facts of the case, may not avail herself of her interposed defense to the adopting procedure. But when we consider the interest of the infant we can find no parallel of the advantages for the child's future, if left in the custody of its mother, with what would be open to it under the judgment sustaining the adoption.

Subsection 4 of KRS 405.170, hereinbefore referred to as constituting one of the defenses to the right of adoption, says:

"In the case of an illegitimate child adoption shall not be permitted without the consent of the Department of Welfare or some agency designated by it to give such consent, or without a full investigation of the case by the Department of Welfare or some agency designated by it to make the investigation."

The report made by the investigator or inspector for the Welfare Department stated all the facts with reference to the conditions and environments surrounding the proposed foster parents, and those of the mother of the infant, substantially as we have hereinbefore recited them. But that report declined to *expressly* recommend the adoption solely because of two facts—(1) that Mr. Thomas was 57 years of age, and (2) that Mrs.

Thomas, who was 34 years of age, was away from home serving her employer in Cincinnati, Ohio, about 6½ hours each work day. It is our conclusion that the Welfare Board is not invested by the language of the statute with authority to withhold its consent to the adoption as based upon such fanciful reasons when all other facts in the case obviously authorized the adoption applied for. But if our interpretation should be incorrect then the quoted subsection of the statute permits the adoption to be made after making "a full investigation of the case by the Department of Welfare or such agency designated by it to make the investigation." Therefore, when such an investigation is made and the facts so reported to the Board preeminently justify the adoption applied for, no such reasons as are set forth in the report in this case should interfere so as to influence the court in the determination of the case.

In this case we have great sympathy for the mother, but the fact remains that her own indiscretion brought about her distressful condition, and the innocent child as the fruits thereof should not have its opportunities to become a useful citizen curtailed through sympathy for its mother. On the contrary our adopting statute making provision for the care, custody, control and rearing of children so situated, should be applied in every case covering the purpose of its enactment. We have been unable to find any reason for a reversal of the judgment, hence it is affirmed.