IN THE MATTER OF THE APPLICATION OF GRACE FOOTE SCHULTZ FOR A WRIT OF HABEAS CORPUS ON BEHALF OF BABY BOY SCHULTZ.

No. 3483

May 29, 1947.                                        181 P.2d 585.

*Lunsford & Goldwater*, of Reno, for Petitioner.

*Thatcher, Woodburn and Forman* and *William J. Cashill*, all of Reno, for Respondent Catholic Welfare Bureau, Inc.

## OPINION

By the Court, EATHER, C. J.:

This is an original proceeding in habeas corpus.

Unquestionably the most difficult and perplexing problems which ever come before a court for decision are those questions which, while involving no financial consideration, have to do with those vitally important but wholly imponderable questions of human relations involving the basis sentiment of the care, custody, control, and welfare of a minor child. Such a one is the present case.

The petition charges that a minor, a baby boy, is unlawfully imprisoned and restrained of his liberty by Mr. and Mrs. John Doe, prospective adoptive parents

of the child. The names of the prospective adoptive parents have not been disclosed during the proceedings, in keeping with the adoption statute. The Nevada Catholic Welfare Bureau, Inc., has acted as respondent in this proceeding and has agreed to deliver Baby Boy Schultz to the petitioner if this court should so direct.

The facts may be briefly summarized. By means of a writ of habeas corpus, the unwed mother of an illegitimate child requests the aid of this court in recovering the custody and possession of a baby boy born October 21, 1946. In consequence of an intention formed several months previous, the mother signed a purported relinquishment for adoption on November 2, 1946. The relinquishment was acted upon by the Nevada Catholic Welfare Bureau, Inc., on November 7, 1946, when its directors placed the child in the home of the prospective adoptive parents. There is a conflict in the testimony as to the date on which an agent of the mother asked for return of the child and the revocation of her relinquishment. However, the facts are clear that formal request for the return of the child was not made by the mother until letters mailed on December 6, 1946. This proceeding was initiated January 29, 1947.

There are three questions presented by this case:

(1) Was the release and relinquishment valid?

(2) If valid, is it revocable?

(3) If revocable, is it for the best interest and welfare of the child to allow it to be revoked?

The pertinent part of our adoption statute is contained in section 1065.02, 1929 Nevada Compiled Laws 1941 Supp., and reads:

"Except as otherwise specified in this section, no adoption shall be permitted except with a written consent duly acknowledged by the living parents of a child, or the mother of a child born out of wedlock. In the case of a child fourteen years of age or over, the consent of such child shall be required and must be given in writing in the presence of the court.

"Where the parent or guardian relinquishes a child for adoption to a recognized organization, institution, or society of this or another state, or to the state department of welfare, which relinquishment is recognized by law, *it shall not be necessary, in adopting said child, to obtain the permission of the parent or guardian who has relinquished the said child.* * * * " (The italics are ours.)

The release and relinquishment signed by the mother in the instant case, among other things, reads as follows:

"This release is made under that certain Act of the Legislature of the State of Nevada, entitled: 'An Act to provide for the adoption of children, defining the Duties of Certain Persons in Relation thereto and Other Matters Relating thereto.' Approved March 28, 1941. (1941 Stats. p. 355)" section 1065.02, supra.

■ The court is of the opinion that a valid relinquishment was given. The mother was fully informed of the consequences of her act. She had considered the matter for months, and after she signed the document it was held for two days to insure that she desired that it be acted upon. Petitioner urges that she was under a "misapprehension" at the time she signed the document. By her statement the only reason for delaying action on the adoption was to give the father an opportunity to appear and assume his responsibilities. The father has not appeared and has in no way indicated he will assume such responsibilities. Petitioner further urges that as the name of the agency to which the child was relinquished was blank, the validity of the document is questionable. This argument was not seriously asserted and no authorities are cited. Suffice to say that the document was given to a duly authorized agent of the Catholic Welfare Bureau and was acted upon by such bureau. We must conclude that at the time of the signing of the document, the mother, an adult, of her own free will annexed her signature knowing and desiring that the baby would be adopted.

The principal question raised by this proceeding is

the right of the mother to revoke her relinquishment. Counsel have fully briefed this point. The authorities cited indicate that many courts have permitted revocation at the discretion of the parent; others allow revocation if estoppel or welfare of the child do not intervene. French v. Catholic Community League, 69 Ohio App. 442, 44 N.E.2d 113; In Re Burke's Adoption, Sur., 60 N.Y.S.2d 421; Adoption of Capparelli, Or., 1946, 175 P.2d 153; Adoption of McDonnell, Cal.App. 1947, 176 P.2d 778.

Conversely many tribunals have denied the right to revoke, and base such denials on (1) principles of contract; (2) estoppel or other equitable grounds; (3) public policy favoring adoption of children, particularly illegitimate children, or (4) the welfare of the child as apparent from the facts. Wyness v. Crowley, 292 Mass. 459, 461, 198 N.E. 758; Lee v. Thomas, 297 Ky. 858, 181 S.W.2d 457; Application of Presler, 171 Misc. 559, 13 N.Y.S.2d 49; Durden v. Johnson et al., 1942, 194 Ga. 689, 22 S.E.2d 514; Stanford v. Gray, 42 Utah 228, 129 P. 423, Ann.Cas.1916A, 989; In Re Adoption of a Minor, 1944, 79 U.S.App.D.C. 191, 144 F.2d 644, 156 A.L.R. 1001; Lane v. Pippin, 110 W.Va. 357, 158 S.E. 673.

■■ As a general proposition parents have the primary and superior right to the custody of their offspring above that of all others, but the declared law has injected into such cases a factor of almost equal dignity as that of the right of the parents, and which is the welfare of the child afforded by the superior advantages that adopting parents are about to and can furnish it, and of which it would be deprived if it remained with its natural parents. But no opinion of any court so far as we are aware approves the right in any one to take away from natural parents the custody of their children solely upon the ground that the adopting parents are better prepared to provide superior advantages to the child which the natural parents for any cause might be unable to provide. But where that situation exists and the parent has agreed

that his or her child might be adopted and has executed such consent or offer in the manner pointed out by the statutory jurisdiction which has been acted on by the proposed adopter, then such consent or agreement, in the absence of fraud or duress in its procurement, plus the vastly increased opportunities of the adopted child, creates a case where there is no alternative but to sustain the adoption applied for.   Lee v. Thomas, supra.

A decision of the principle involved in the instant case, is included in the opinion in the case of Wyness v. Crowley, 292 Mass. 459, 461, 198 N.E. 758, 759.   We quote:

"To accede to the contention that such voluntary consent may be withdrawn would be equivalent to saying that parties may come to a court, deliberately give their assent to actions by the court in matters affecting their interests, and afterwards, at their will and pleasure, return to the court and undo what they did because on a future day they did not like it."

In the case of Stanford v. Gray, 42 Utah 228, 129 P. 423, 426, Ann.Cas. 1916A, 989, the court stated as follows:

"Ordinarily the law presumes that the best interest of the child will be subserved by allowing it to remain in the custody of the parents, no matter how poor and humble they may be, though wealth and worldly advancement may be offered in the home of another.   Where, however, a parent, by writing or otherwise, has voluntarily transferred and delivered his minor child into the custody and under the control of another, as in the case at bar, and then seeks to recover possession of the child by writ of habeas corpus, such parent is invoking the exercise of the equitable discretion of the court to disrupt private domestic relations which he has voluntarily brought about, and the court will not grant the relief, unless upon a hearing of all the facts it is of the opinion that the best interests of the child would be promoted thereby."

"From birth an infant is a ward of the State.   It

stands in the relation of parens patriae. In this and similar proceedings the fundamental consideration is the welfare of the infant. People ex rel. Converse v. Derrick, 146 Misc. 73, 77, 78, 261 N.Y.S. 447.

"The infant's welfare is paramount to the natural right of a parent." Matter of Bock (Breitung), 280 N.Y. 349, 353, 21 N.E.2d 186; Application of Presler, supra [171 Mics. 559, 13 N.Y.S.2d 52].

"Statutory requirements must be strictly complied with in adoption proceeding, since adoption is a proceeding in derogation of common law. * * *

"Where natural parents have absolutely surrendered their child to county commissioner of public welfare, only basis for a subsequent adoption of the child is the execution by commissioner of a written consent which takes the place of the written consent of natural parents required in case of a voluntary adoption. * * *

"Natural parents, by unconditionally surrendering custody of their child to county commissioner of public welfare, divested themselves of any power thereafter to authorize an adoption of such child by written consent." In re Whitcomb, 271 App. Div. 11, 61 N.Y.S.2d 1.

This court, in previously considering an oral argument by which a parent released the care and custody of a minor child to third parties, enunciated the only language which is helpful here. The opinion of the court states:

"The weight of modern authority, however, seems to recognize such agreements as enforceable where it appears to the advantage of the minor to enforce the same. This latter view seems to us to be supported by the better reason. It recognizes the superior rights of natural parents, all other matters being equal, but places the interest of the child as the first consideration, and, where it appears that the interest of the child will manifestly be advanced by enforcing such agreement, the same will not be disturbed." Ex parte Swall, 36 Nev. 171, 195, 134 P. 96, 97, Ann.Cas. 1915B, 1015.

The court further cited with approval Stanford v. Gray, supra, a closely similar case to the instant case, wherein the Utah court held:

"There are some authorities which hold that a contract made by a parent in which he surrenders the care, control, and custody of his minor child to another is void as against public policy. The great weight of authority, however, sustains the position of appellants that a parent may by contract legally transfer and surrender his infant child into the custody of another where the interest of the child is not prejudiced by the transaction, and in all controversies arising respecting the custody of the child after such transfer and surrender have been made, the paramount consideration—the question of controlling importance—is the interest, welfare, and happiness of the child. In other words, while contracts of this kind, fairly and voluntarily entered into, are valid as between the parties, they will not be enforced to the detriment of the child."

Substantial support of the position of respondents is furnished by the exhaustive and well-reasoned opinion of the court of appeals, for the District of Columbia, In Re Adoption of a Minor, supra. There the court was dealing with an adoption statute similar with ours, and like the Nevada statute, a recent legislative act. Also the court was confronted with an attempted revocation of a consent to adoption by the mother of an illegitimate child. The court, in denying the right to revoke, placed emphasis on the tense of the wording of the statute passed by Congress in 1937, D.C.Code, 1940, secs. 16–201 et seq., stating that the statute "speaks of an act completed," and finds in the act the words, "no decree of adoption shall be made unless the court shall find that the following persons *have consented to the adoption.*" The Nevada statute, passed in 1941, sec. 1065.03, N.C.L. 1931–41, Supp., also uses the words of an act completed. "* * * *that all required consents have been given.*" (The italics are ours.)

The reasoning of the court of appeals that such language indicates legislative intent to make the consent irrevocable is equally applicable here.

However compelling the examination of the wording of the statute by the court of appeals might prove, the great value of the opinion of In Re Adoption of a Minor, arises from the court's consideration of the history and theory of adoption and its ramifications, including child life, family welfare, juvenile delinquency, illegitimacy, and the great public interest in successful adoption procedure. The court concluded:

"It is apparent that if in particular cases the unstable whims and fancies of natural mothers were permitted, first, to put in motion all the flow of parental love and expenditure of time, energy and money which is involved in adoption, and then, as casually, put the whole process in reverse, the major purpose of the statute would be largely defeated. Doctors of medicine and divinity, potential adoptive parents and social workers would be stymied in their rehabilitative efforts. A premium would, instead, be put upon the emotional instability which produces illegitimates; to say nothing of the possibilities for racketeering which such an interpretation of the law would put in reach of those who may be criminal in their tendencies as well as lacking in the qualities of parenthood. The new law cannot prevent illegitimacy or remove its stigma, generally, but to the extent that it may secure desirable placement of even a few illegitimate children it may avoid some of its most dangerous results. But to do so it is necessary that such children and their adoptive parents be protected against possibilities of the kind suggested. *Especially in the adoption of illegitimate children it is desirable that the break* between infant and consenting mother be abrupt and final." (The italics are ours.)

While the court is cognizant of and sympathetic to, the honest efforts of a natural mother to recover her child, the welfare of the child and the intent and purpose

of the adoption law must be the controlling factors in the determination of this matter. At the hearing evidence was introduced regarding the welfare of the child. The home of the prospective parents was established as a proper environment for the child.

■ Following the authorities cited above, the court finds that the relinquishment of the mother, having been freely and voluntarily given, is irrevocable, and, there being nothing to indicate that it would be to the detriment of the child to enforce such relinquishment, the document must be accorded the full effect intended under the statute.

■ Public policy demands that the adoption act should not be nullified by a decision that causes the public to fear the consequences of adopting a child with the full knowledge that their efforts are at the whim and caprice of a natural parent.

This proceeding is dismissed.

BADT, J.: I concur.

HORSEY, J., dissenting.

I feel impelled to dissent from the majority opinion in this case.

The pertinent facts involved in this proceeding may be summarized as follows:

Grace Foote Schultz, the petitioner on behalf of Baby Boy Schultz, is the unmarried mother of said baby boy, who was born out of wedlock on October 21, 1946, at the St. Mary's hospital, in Reno, Nevada. The evidence upon the hearing reveals that the petitioner came to Reno in July 1946, and called upon a physician some time in August 1946. Miss Schultz testified she asked the physician to take care of her, and that she told him at that time that she wanted to put the child out for adoption; that she saw the doctor about six times after that, and before she went to the hospital, but did not talk to him further about adoption. The physician testified Miss Schultz first called upon him August 29, 1946, at

which time she told him she wanted to adopt the baby out, and that she was unmarried, and that he told her he would take care of that and not to worry any more about it; that her next visit to him was September 16, 1946. The physician, at that point in his testimony was asked whether, at that time (September 16, 1946), they discussed the proposed adoption, and answered, "I talked to her about the financial arrangements before the delivery, the hospitalization of herself and the baby." The following questions and answers were then propounded and made:

"Q. (By Mr. Woodburn): Did she mention, at that time, the state welfare bureau? A. I believe at that time she did mention she had been there.

"Q. And what did you tell her at that time? A. I said we would take care of that, she didn't have to worry about it.

"Q. When was the next time you saw her? A. The 30th of September 1946.

"Q. Did you talk to her then about the proposed adoption? A. Not that I recall.

"Q. When did you next see her? A. October 11th.

"Q. And do you recall whether at that time you had any discussion with her about the proposed adoption? A. No, I do not.

"Q. And the next time you saw her was when she went to the hospital? A. Yes, on the night of October 20th.

"Q. And the baby was born on the 21st? A. The morning of the 21st of October.

"Q. Did you discuss with her anything about adoption then? A. No.

"Q. You heard Miss Schultz' testimony that at the hospital she asked you if she could see her baby, and you said they didn't do that in the hospital? A. She never asked me personally to see the child, at any time."

The doctor did not deny that Miss Schultz asked the nurse, or nurses, the privilege of seeing the baby.

It will be noted from the foregoing that, according to

the physician's testimony, Miss Schultz discussed adoption with him only upon the occasion of her first visit, August 29, and then merely told him "she wanted to adopt the child out, and that she was unmarried," and that he "told her we would take care of that and not to worry any more about it." It clearly appears, therefore, that Miss Schultz made no express request of the physician to do anything in regard to adoption, but that he volunteered to take care of that, and told her not to worry about it. She also told him, as he testified, that she had been to the state welfare bureau.

Miss Schultz' testimony as to what she told the physician, upon the occasion of her first visit, was, "I mentioned the fact that I didn't have any money, and wanted to adopt the baby out." She stated further she did not talk to him again about it until the doctor and Mr. Halley came to her room with the papers for her to sign, on November 2, 1946.

In other portions of her testimony, Miss Schultz told about visiting the state child welfare department branch office in Las Vegas, in April 1946, that she continued in touch with said department after coming to Reno, in July, 1946, and discussed with Mrs. Bromberg the opportunities for the child after it was born, and what could be done with it, and that Mrs. Bromberg was to have it adopted in a foster home.

From the testimony of both the physician and Miss Schultz, it is clear that she left the hospital October 28, 1946, that she continued ill at her home, and that the physician attended her; that she was suffering severe pains on October 31, 1946, the result of the birth of the child; that the doctor prescribed medicine for her, and came to see her the following morning, but that adoption was not then discussed.

Upon the point of whether Miss Schultz requested the calling of Mrs. Bromberg, of the state department of public welfare, she testified she so requested the physician, also one of the nurses.

The physician testified Miss Schultz did not, at any

time after the baby was born, ask him to call Mrs. Bromberg. He was not asked as to whether she so requested before the baby was born. He testified further that Miss Schultz told him "she had asked some one to call Mrs. Bromberg's office, and she wasn't there, and she asked that Mrs. Bromberg contact Miss Schultz." Mrs. Bromberg testified, in that connection, that she received no such call.

As to what occurred at the room of Miss Schultz on November 2, 1946, upon the occasion when the document purporting to be a release or relinquishment of Baby Boy Schultz was signed, there are no substantial differences between the testimony of Miss Schultz, the physician and Mr. Halley. The physician, in that connection, testified, on direct examination, as follows:

"Well, Mr. Halley had prepared the documents for her to sign. We went to her room, upstairs, and I explained the reason for our visit, that Mr. Halley had prepared the documents for the adoption of the child, told her to read it over and sign it. Mr. Halley told her if she had any questions regarding the document to ask him, and he would gladly explain it to her. She read it over for some time, and the only comment she had was about it sounding rather harsh with the word 'forever' in it.

"Q. At that time did Mr. Halley advise her as to that? A. Yes. And we tried to explain to her we didn't want to rush her into signing something she didn't want to. She had already told me she was expecting a phone call from the child's father. Mr. Halley said he would hold the paper she had signed, until the following Monday, November 4th, although we thought at that time she had definitely made up her mind.

"Q. Did she telephone you on the following Monday, November 4th? A. Yes, and authorized us to go ahead." (Miss Schultz' testimony on that point was that she stated, in the said telephone conversation, that she hadn't received her phone call from the child's father, and that she guessed there was nothing else to do.)

"Q. The baby was to be placed by the Catholic welfare bureau? A. That is what *I* understood, yes." (Italics mine.)

In this opinion I shall follow the arrangement, as to the treatment of the questions involved, which has been followed by the respective counsel, and, also, in the majority opinion, same being as follows:

1. Was the release or relinquishment valid?
2. If valid, is it revocable?
3. If revocable, is it for the best interest and welfare of the child to allow it to be revoked?

The release or relinquishment, as disclosed by the copy appended to respondent's return, is as follows:

"Release of Child

"I, Grace F. Schultz, of Reno, Washoe County, Nevada, do hereby relinquish and release forever to Nevada Catholic Welfare Bureau, Inc., of Reno, Nevada, my rights as a parent in and to my male child, Baby Schultz, born at St. Mary's Hospital, City of Reno, County of Washoe, State of Nevada, on the 21st day of October, 1946, which said child was born out of wedlock and the undersigned represents that she is the Mother of said minor male child, now the age of 12 days and that she hereby relinquishes unto Nevada Catholic Welfare Bureau, Inc., all her rights to said child and respectfully requests any court of competent jurisdiction to enter its order of adoption.

"This release, is made under that certain Act of the Legislature of the State of Nevada, entitled, 'An Act to Provide for the Adoption of Children, Defining the Duties of Certain Persons in Relation Thereto and Other Matters Relating Thereto,' Approved March 28, 1941 (1941 Stats. 355.)

"Grace F. Schultz

"State of Nevada,  } ss.
County of Washoe.  }

"On this 2nd day of November, 1946, personally appeared before me, the undersigned, a Notary Public in

and for the County of Washoe, State of Nevada, Grace F. Schultz, known to me to be the person described in and who executed the annexed instrument, who acknowledged to me that she executed the same freely and voluntarily and for the uses and purposes therein mentioned.

"In witness whereof, I have hereunto set my hand and affixed my official seal at my office in the County of Washoe, State of Nevada, the day and year in this certificate first above written.

"John S. Halley

"(Seal)      "Notary Public in and for the County of Washoe, State of Nevada."

It is alleged in the petition herein, and admitted by respondent by failing to deny same, that the document presented to petitioner by the physician and Mr. Halley, on November 2, 1946, did not, at said time, contain the names of any of the parties thereto; that it did not contain the name, either of the petitioner, or of any organization, institution or society, or of the state department of welfare, or the name or names of any proposed adoptive parents.

It is further alleged by the petitioner, and admitted by respondent, that such purported document was notarized on or about November 4, 1946, by John S. Halley, of the city of Reno, Nevada, and that on or about November 5, 1946, the said physician delivered said document to a private welfare agency in Reno, Nevada, to-wit, the Nevada Catholic Welfare Bureau, Inc., and specifically to Father Collins thereof, and that pursuant to said purported relinquishment and consent said Father Collins obtained said Baby Boy Schultz from the St. Mary's Hospital, where the child then was, and delivered said to Mr. and Mrs. Doe, the proposed adoptive parties.

The omission of those names, because of the allegation and admission of the pleadings, is an established fact in the case and cannot properly be ignored.

In the majority opinion it is stated:

"Petitioner further urges that as the name of the agency to which the child was relinquished was blank, the validity of the document is questionable. This argument was not seriously asserted and no authorities are cited. Suffice to say that the document was given to a duly authorized agent of the Catholic Welfare Bureau and was acted upon by such bureau. We must conclude that at the time of the signing of the document, the mother, an adult, of her own free will annexed her signature knowing and desiring that the baby would be adopted."

I cannot agree. This statement overlooks the fact that the mother of this child, Baby Boy Schultz, had had no negotiations with the Catholic Welfare Bureau, Inc., did not even know, nor was she then informed, that such an organization existed, nor that there was any intention on the part of the physician or Mr. Halley that said society should act in the matter of the adoption of the child. It is doubtful whether Mr. Halley (who testified he is not a social worker, nor a duly authorized agent of said society, but that he had performed legal services for them, as assistant to Mr. Diskin, from time to time, and had prepared and taken for them, in a similar case, a release or relinquishment) had been given any authority by said society, other than to prepare the release or relinquishment. Be that as it may, there is no evidence whatever that Miss Schultz was informed, or knew, that Mr. Halley was so acting for and on behalf of the Catholic Welfare Bureau, Inc. In fact, as above stated, she did not know such organization existed, or was at all involved in the transaction, nor had she any idea that said organization or society was to act in placing the child, or in any capacity whatever, until she received a telephone call from Father Collins, after he had received the release or relinquishment. As to this matter of Miss Schultz' knowledge or consent, which is so fundamental

in determining the validity or invalidity of the document in question, the proper application of our statute, sec. 1065.02, Supp.1931–1941, Nevada Compiled Laws 1929, and in establishing the just rights of the parties as to Baby Boy Schultz, for this court to decline to consider it and to fail to apply to it the well established principles of the law of contracts and of statutory construction, merely because the learned chief justice, who wrote the majority opinion, chooses to conclude that the "argument" (of petitioner's attorney) "was not seriously asserted and no authorities are cited," in my opinion places the administration of justice in this case upon a very unsubstantial basis.

This matter is asserted and argued both in petitioner's opening brief and in her reply brief, and, in my opinion, we have no right to say same was not asserted seriously, and the failure to cite authorities does not justify the court in declining to consider a fundamental question legally before the court, and the proper determination of which is absolutely essential to the accomplishment of justice in the case.

It is elementary in the law of contracts (and the release or relinquishment is such a document as the cases generally denominate a surrender agreement) that at least two parties are essential to the formation of any valid contract or agreement; that such parties must be known to each other, in order that they may severally determine whether they wish to contract one with the other. This is necessary, because, among the principal elements of an agreement or contract, are consent and intention. It is a relationship which, to arise, must be entered into freely and voluntarily and intelligently, in order that there may be a meeting of the minds and that contractual relations may be effected. Restatement of the Law of Contracts, vol. 1, sec. 15, p. 17; 12 Am.Jur., sec. 16, p. 514, and cases cited in footnote 10.

The subject of filling in blank spaces in contracts, after

the execution of the contract, is treated in 17 C.J.S., Contracts, sec. 65, p. 416, and the many authorities cited in the footnotes. The text of said section 65 is as follows:

"A writing is incomplete as an agreement where blanks as to essential matters are left in it, unless they can be supplied from other parts of the writing itself, or unless and until such blanks are lawfully filled. The fact, however, that a contract contains blanks when signed does not necessarily invalidate it, and, subject to an exception as to sealed instruments, recognized in some jurisdictions, one signing a paper and leaving blanks in it is ordinarily presumed to give authority to the holder to fill the blanks in accordance with the general character of the instrument, and parol authority is sufficient to authorize the filling of blanks in writings not under seal, in the absence of a contravening statute. The person authorized to fill blanks must act in accordance with the authority conferred, but, even though such authority may have been exceeded, the instrument may be binding as completed, in favor of a third person who has justifiably and in good faith changed his position in reliance thereon. Questions as to implied authority to fill blanks commonly arise in determining the existence and effect of alterations of instruments and are considered in that connection in the title Alteration of Instruments, secs. 63–66.

"Blanks in instruments may be rejected as surplusage if the parties so intended, and the intent must be gathered as an inference of fact from the whole setting of the transaction."

In footnote 26 to the text is the following excerpt from the opinion in the case of Bruegge v. State Bank of Wellston, Mo.Supp., 74 S.W.2d 835.

"One of tests of existence of implied authority to fill in blanks in instrument is whether completed instrument correctly states agreement between parties."

Obviously, if Miss Schultz had been informed, in substance, that if she consented to the adoption of her child, and signed the document presented to her, she would be relinquishing the child to the Catholic Welfare Bureau, Inc., as the institution to act in her place in selecting the adoptive parents, and in formally consenting to the adoption, and if she had expressed her assent that such institution should so act, and if the name of the relinquishee had been left blank in the instrument, the physician and Halley, or either of them, would, under such circumstances, have been impliedly authorized to fill in such blank space, to conform to the intention and agreement of the parties. But when all knowledge or information, as to whom, or as to what institution, was to act, was withheld from her, either by concealment or by inadvertence, she was in no position to exercise her judgment or discretion in determining whether said institution should be selected. Indeed, she could not, under such circumstances, be deemed to have acquiesced, by implication, in the selection of such Catholic Welfare Bureau, Inc., when she did not then know of its existence, and had not been informed thereof, nor anything said to indicate to Mr. Halley and the physician that it should serve in placing the child for adoption.

Adoption was unknown to the common law, is entirely a matter of statute, and such statutes must be strictly construed as to the rights of natural parents. 1 Am.Jur. pp. 622, 627, particularly sec. 9, on pp. 626, 627.

The portion of our latest adoption statute (the act of 1941) pertinent to the question of relinquishment, by a parent or guardian, of a child for adoption to a recognized organization, institution or society of this or another state, or to the state department of welfare, is found in sec. 1065.02, N.C.L.1929, Supp.1931–1941, and is as follows:

"Except as otherwise specified in this section, no adoption shall be permitted except with a written consent duly acknowledged by the living parents of a child, or

the mother of a child born out of wedlock. In the case of a child fourteen years of age or over, the consent of such child shall be required and must be given in writing in the presence of the court.

"Where the parent or guardian relinquishes a child for adoption to a recognized organization, institution or society of this or another state, or to the state department of welfare, which relinquishment is recognized by law, it shall not be necessary, in adopting said child, to obtain the permission of the parent or guardian who has relinquished the said child."

Giving the statute the strict construction required in favor of the rights of the natural parent or parents (assuming the parent has not abandoned the child, become incompetent, or otherwise is within the provisions of the Statute of 1921, as amended, none of which are applicable to the situation existing in the instant case), it is clear that it is only the parent or guardian of the child upon whom authority is conferred by the statute to relinquish a child for adoption. The statute recognizes, generally, the value of organizations, institutions and societies, including the state department of welfare, because of their usual facilities and training for, and experience in, social work, and provides, therefore, that it is only to such an institution that relinquishment for the important purpose of adoption may be made. Nevertheless, the statute retains in the parent or guardian the exclusive right to choose the organization institution or society, or the department of public welfare, to whom such relinquishment may be made. This authority to choose such organization, institution or society, etc., cannot be delegated to, or conferred by the parent or guardian upon, anyone else, either expressly or by implication. The statute says, "Where the *parent or guardian* relinquishes * * *." (Italics mine.) Obviously, no one else is intended, or they would be named in the statute, nor is the power to delegate the authority conferred, in the absence of any statement in

the statute from which such a legislative intent could be reasonably implied. Such interpretation is required by the rule of strict construction as to natural parents, above mentioned. By reason of the strong ties of blood, and, normally, of love and affection, existing between a child and the natural parent, it is reasonable to believe that the natural parent, in most cases at least, will more earnestly and seriously than anyone else devote his or her best efforts and thoughts to a wise, careful, and prudent selection of the relinquishee to serve in the very serious and important task of acting in place of the natural parent in the selection of the proposed adoptive parents. In the instant case, it does not appear that there was any thought or intention on the part of Miss Schultz to delegate that authority to anyone to act for her in choosing such an institution, but if there had been such intention on her part, any such delegation of authority would have been manifestly void, being contrary to the terms of the statute, which expressly and exclusively confines such authority to a parent or guardian of the child. In the New York case of In re Anonymous, 178 Misc. 142, 33 N.Y.S.2d, 798, wherein, like in the instant case, the names of the party or parties to whom the child was to be surrendered or relinquished were left blank, the surrogate stated, in his opinion.

"Nor can the agreement be treated as a surrender of the child within the meaning of section 111, subd. 4; such a surrender can be made only to an authorized agency. In the case at bar the facts clearly indicate there was no surrender to an authorized agency."

The document involved being in blank as to the name of the party or parties to whom the child was surrendered or relinquished, there was no surrender *to an authorized agency*. It was simply an uncompleted, ineffective document. (Italics mine.)

For a review of Pennsylvania cases as to the effect of signing and acknowledging a "blanket consent," and an

extensive discussion of the question, see In re Andrews, 14 D. & C., Pa. p. 343.

Beside failing to name the organization, institution or society to which the child was to be relinquished, the release or relinquishment in the instant case, if attempted to be applied as a relinquishment to an institution or other agency, does not comply with the statute, sec. 1065.02, Supp.1931–1941, N.C.L.1929, in other important respects as follows:

(a) It does not relinquish for the purpose of adoption only, but attempts to relinquish *all her rights* to said child. This far transcends the authority conferred by the statute, which provides for relinquishment merely for adoption. This, I believe, means that pending the actual adoption and assumption by the adoptive parents of the rights and responsibilities thereof, the natural parents, or parent (in the case of an illegitimate child), retain, under the statute, their full rights and responsibilities as to the child. The function of such an organization or institution is merely to select the proposed adoptive parents, and arrange for and consent to the adoption, and, perhaps, to arrange, in the meantime, for a foster home, subject to the approval of the department of public welfare. Indeed, under sec. 4 of the act of 1939, Stats.1939, p. 304, except for the purpose of adoption, assignment or transfer by a parent, or parents, of rights to the permanent care, custody, and control of a child under sixteen years of age is prohibited.

(b) There is nothing in the release or relinquishment providing that the relinquishee shall, or agrees to, select the adoptive parents, or make arrangements for adoption, as is usual in such documents.

(c) There is a mere request (not a consent) to any court of competent jurisdiction to enter its order of adoption. This request is not confined to an adoption by proposed adoptive parents selected by the organization or agency to which relinquishment has been made, but

could readily be construed to mean that Miss Schultz was requesting, or consenting in advance to, adoption by anyone presenting a petition for adoption. This would be contrary to sound public policy, and far beyond the scope of the authority conferred by the statute.

It may well be noted at this point that the very language of this so-called release or relinquishment indicates that it was drawn in the form and contains the provisions which would be suitable for a transfer of all the rights of the mother to the child direct to proposed adoptive parents. If so applied, the transfer of *all* rights, instead of a limitation of the rights transferred to the purpose of adoption, and the omission of suitable provisions defining the duty of the relinquishee as to selecting the proposed adoptive parents, and the failure to limit the request (or consent) to the adoptees thus selected, becomes understandable. It is clear that under the statute the natural parent could delegate her authority to choose and consent to the adoptive parents only to a recognized organization, institution or society, or to the department of welfare, and could not, therefore, be deemed to have intended to so delegate such authority to the physician, or Mr. Halley. Obviously, therefore, neither of said persons could choose the adoptive parents for her, without submitting their names to her, and affording her the opportunity of selection or rejection. If, for instance, they had submitted to her the names of Mr. and Mrs. Doe, and she had, in the exercise of her exclusive discretion, agreed to their names being inserted in the said document, or had inserted the names herself, then, and in that event, the language of the document would be suitable and fitting to properly and truly describe the intended transaction. But in the absence of any report or submission to Miss Schultz, by the physician or Mr. Halley, or anyone else, of the identity of the proposed adoptive parents, and in the absence of all knowledge on her part as to their identity, there could be no consent on her part to entering into any contract

with them, nor selection of such persons by her as the adoptive parents of her child. It is plain that whoever actually selected Mr. and Mrs. Doe acted entirely without authority from Miss Schultz, for she did not know of the existence of Mr. and Mrs. Doe, nor of their desire for the child, and was afforded no opportunity to determine as to whether or not she was willing that they adopt the child. From the form and language of the instrument, the draftsman, when same was drawn, evidently intended the adoptive parents to be selected by Miss Schultz, but their names were not submitted to her, and later it apparently was decided by some one to usurp her sole authority, and transfer the child to a social welfare agency or institution, namely, the Catholic Welfare Bureau, Inc.

If treated as an instrument in which only the names of the adoptive parents were omitted, as the language clearly indicates that it should be, the supplying of the name of Catholic Welfare Bureau, Inc., would constitute the creation, by the party or parties filling the blank space, of an instrument which could only be created by Miss Schultz, and to do so she would, of course, have had to possess sufficient knowledge as to the identity of the proposed relinquishee to enable her to exercise her discretion in making the selection. The instrument was simply not sufficiently completed to constitute a valid instrument or contract, and could not be completed by anyone other than Miss Schultz, and she did not do so, nor did she attempt to authorize anyone else to do so. In that connection see, particularly, 3 C.J.S., Alteration of Instruments, sec. 68, p. 978, and the authorities cited in footnote 19; also, 3 C.J.S., Alteration of Instruments, sec. 63, p. 977, and the authorities cited in footnote 12.

The so-called release or relinquishment in the instant case is, in my judgment, totally void and of no effect, not only because the document was not sufficiently completed to constitute a valid surrender agreement or relinquishment, either to an institution or directly, by Miss

Schultz, to any proposed adoptive parents, but, also, because, if attempted to be applied to an institution or other agency, its provisions are so vague, indefinite and uncertain as to render same unenforceable; also, because, in the instance mentioned, the document, in my opinion, attempts to confer power and authority upon the relinquishee far in excess of that authorized by the statute; and also, because it leaves the way open for approval of adoption requests by others than those selected by such an organization, institution, or society, which is contrary to sound public policy.

The release or relinquishment being absolutely void, for the reasons stated, same could confer no rights, either upon the Catholic Welfare Bureau, Inc., or upon Mr. and Mrs. John Doe, who now have Baby Boy Schultz in their custody, by virtue of the said child being delivered to them by such agency. In my judgment, any consent to adoption which may have been or may hereafter be given by said agency to the adoption of said child by Mr. and Mrs. Doe is, or will be, totally void, if based only upon such release or relinquishment. In the absence of the consent of Grace Foote Schultz, the mother, they cannot validly or legally adopt said child. They have the actual custody of the child, but, regardless of whether they actually knew it or not, its delivery to them by the Catholic Welfare Bureau, Inc., not only was legally unauthorized by the mother, but was directly contrary to the provisions of the act approved March 25, 1939, Statutes 1939, p. 303, same being sections 1061–1061.04, N.C.L.Supp. 1931–1941, because the approval of the state department of welfare to the placing of said child was not obtained prior to such placement. Such delivery of custody being thus illegal, no rights could be conferred thereby upon Mr. and Mrs. Doe. While the position of Mr. and Mrs. Doe in this matter would be most unfortunate and regrettable if my view should prevail, the rights of Grace Foote Schultz should, necessarily, be held paramount, she being the natural mother of the child.

It would unduly lengthen this opinion to state in detail the many instances wherein I consider Miss Schultz was treated unfairly, especially by the physician. His eagerness to favor his friends, Mr. and Mrs. Doe, who were childless and desired to adopt a child, and, perhaps, his desire to rid the hospital of the child, undoubtedly were the underlying causes which prompted him to assume the initiative in having Miss Schultz execute the release and relinquishment, and to move toward that end, and the delivery of custody to Mr. and Mrs. Doe, with undue haste and little consideration for the rights or the condition of Miss Schultz, who was ill and his patient at the time. In her humiliation and desolation of mind and spirit, she was undoubtedly much under the influence of the physician's more dominant personality. She did not receive that consideration, encouragement, and advice which was so essential to enable her, freely and without the undue pressure of circumstances and personal influence of others, to determine whether or not she wished to give up her child. If he had not been too much in a hurry to get the job done and the child placed with Mr. and Mrs. Doe (such action being doubtless prompted by the acts of the physician), Father Collins, who appears to have been the medium through which the physician was acting to accomplish his objective quickly, would probably have waited until Miss Schultz was sufficiently recovered from her illness to keep her appointment with him, before placing the child, and would have ascertained she desired to keep the child, and, perhaps, would not have proceeded to place same with Mr. and Mrs. Doe; or, if he had reported the matter to the state department of welfare, which the said statute of 1939 requires, before placing the child, Mr. and Mrs. Doe might have been spared the heartache which would be theirs if the child were ordered to be returned to its mother, pursuant to her paramount right as the natural parent. The policy of that department, as testified to by Mrs. Bromberg, is to encourage the mother, under proper circumstances, to keep her child.

Upon habeas corpus we should, to a reasonable extent, give consideration to the welfare, best interest and happiness of the child. But, as has been well expressed in many cases, differences in material circumstances alone will not justify depriving a natural parent of the custody, love and affection of her child. This principle has been expressed in the case of In Matter of Livingston, 2d Dept., 151 App.Div. 1, at page 7, 135 N.Y.S. 328, at page 332, as follows:

"While the right of the natural parents to the custody of their children is not a proprietary right in the same sense as if the child were a chattel, and while it is accompanied by a corresponding duty which arises from the relation of parent and child, it has ever been regarded, even in primitive civilizations, as one of the highest of natural rights. The state cannot interfere with this right simply to better the moral and temporal welfare of the child as against an unoffending parent. If so, then the state might transfer the handsome child of poor parents to the custody of a childless couple of wealth and moral refinement against the will of the natural parent."

I have no doubt, from the evidence, that Mr. and Mrs. Doe are persons of education, culture, refinement, and splendid character, and that Baby Boy Schultz has, and would continue to have, a most excellent home, if left in their custody. Mr. Doe, however, is a salaried official, in moderate financial circumstances, and there is nothing to show that Mr. and Mrs. Ted Clapper, the stepfather and mother of Miss Schultz, are not able properly to care for her and for the baby, and to afford them a fit and decent home. There is nothing in the evidence which questions at all the good character of Miss Schultz, at the present time or at any time, except as to her one misstep. We have not the right to require more.

There is in every child a natural longing for its natural parents, which increases with the passing years, as the child grows up and becomes more developed, mentally

and spiritually. This is particularly true, I believe, as to the longing for its mother, which is a biological human attribute, and which nothing but her presence, if living, can fully satisfy; and for a child to be bereft of knowledge of his or her mother leaves in the human heart a void or vacancy which naturally mars future happiness. It has, I believe, continuously since the establishment of our territorial government, been the policy of this court to give paramount consideration, in its decisions and rulings in legal proceedings, to the rights of the natural parents, whenever and wherever reasonably practicable.

In the case of Jackson v. Spellman, 55 Nev. 174, at page 180, 28 P.2d 125, at page 127, 91 A.L.R. 1381, the late Mr. Justice DUCKER, in beautiful and eloquent language, expressed this policy as follows:

"The act of adoption takes a child away from its parent by destroying the legal and natural relation between them and creating in its stead an artificial relation deemed by law to be for the best interests of the child. It is in derogation of the common law which regards the natural rights of the parents to be of a sacred and enduring character. As the statute confers a special power of this kind which may be exerted in opposition to the wishes, or without the consent of the parents, it should be strictly construed in their favor. The courts are quite uniform in applying the rule of strict construction in favor of the parents' natural rights in adoption proceedings."

I believe that we should not depart from a policy so fully established and consistently adhered to by this court, and which, in my view, is sound, both from a legal and a humanitarian standpoint. The same result would be reached, in my opinion, in the instant case, if the release and relinquishment could be held valid as to its execution, and the law as to revocation of such an instrument were applied to the facts and circumstances of this case in accordance with the great weight of American authority. I believe further that, under the facts and

circumstances of the case at bar, revocation would be indicated even under the doctrine of the exceptional cases such as Lee v. Thomas, 297 Ky. 858, 181 S.W.2d 457; Wyness v. Crowley, 292 Mass. 459, 461, 198 N. E. 758; and In re Adoption of a Minor, 79 U.S.App.D.C. 191, 144 F.2d 644.

It is my opinion that this court should order the delivery of the custody of Baby Boy Schultz to Grace Foote Schultz, his natural mother, the petitioner herein.