**WELSH v. YOUNG et al.**

Court of Appeals of Kentucky.
June 12, 1951.

L. M. Ackman, Williamstown, for appellant.

Frank S. Connely, Warsaw, for appellees.

COMBS, Justice.

This is an adoption proceeding filed in the Gallatin Circuit Court on July 23, 1949, by appellees, Allen H. Young and Gladys Young, his wife, against appellant, Reba Welsh and her illegitimate child, Anna Jane Ellis. Appellant, who will be referred to as the mother, resisted the adoption but the court overruled her objection and entered an order sustaining the prayer of the petition. The mother appeals.

The applicable sections of the statute are KRS 405.250–405.380 (1948 Edition). These sections were repealed by the 1950 Legislature, and reenacted, with modifications, as KRS 199.470–199.590.

There is no serious contention that appellees failed to follow the statutory procedure. The Department of Welfare was notified of the filing of the petition for adoption, as provided by KRS 405.290, and the record contains two letters from an agent of the Department, dated July 27 and August 29, 1949, stating, in substance, that due to a shortage of personnel the Department would be unable to make a report on the case, and further stating: "We are willing to abide by the decision of the court in this case."

At the time the petition was filed, the child, Anna Jane, was six years old. She was placed in appellees' home by consent of her mother on December 15, 1948. On June 15, 1949, the mother signed and acknowledged an instrument designated "consent of adoption" by which she agreed and consented that appellees might adopt Anna Jane. The mother's defensive pleadings, consisting of special and general demurrers and answer and counterclaim, were filed on November 23, 1949, and the case was heard by the trial Judge in open court on that day.

It is shown by the record that the mother has another illegitimate child, a little boy who now lives with an aunt in Indiana. In the fall of 1948, on complaint of the grandmother of Anna Jane, a warrant was issued by the County Judge of Gallatin County charging the mother with desertion of her children. She was arrested in Louisville and executed bond for her return to Gallatin County for trial. She was not tried on the charge and it was shortly afterwards that Anna Jane was placed in the home of appellees. Her brother was placed with a family in Louisville but they kept him only a few days.

The mother married a man by the name of Welsh in May, 1949. At the time of the hearing, they were living in a second floor apartment on East Broadway in Louisville. It appears that the apartment consists of two rooms, with a small kitchenette or pantry. At the time of the hearing, the mother was 28 years old and her husband 26. The husband was employed as a carpenter's helper for a construction company at a wage of approximately $60 per week. He had held this job for about six weeks. Prior to that he was employed as a bartender.

The mother alleged in her answer and counterclaim that at the time she signed the consent to adoption appellees assured

her she could visit Anna Jane and have the child visit her when she was not in school; that appellees have repudiated that agreement and have stated they will not permit her to visit Anna Jane in the future.

It appears that appellees are respected citizens in their community and, although in modest financial circumstances, are capable of rearing and educating Anna Jane. Allen Young is 32 years old and his wife is 31. They were married in 1940 but at the time of the hearing had no children of their own, although Mrs. Young was then pregnant. Mr. Young is a ferryboat operator and owns a one-half interest in the ferry which he operates. According to him, the ferry equipment, including the boat, is worth close to $10,000. The Youngs live in a 3-room house, located on a double lot close to the ferry landing. Mr. Young earns between $60 and $75 per week.

The trial court rendered the following oral opinion:

"In the first place I want to say I didn't know Mr. and Mrs. Young previous to their coming to Warsaw. My home is here in Warsaw and I remember their coming to Warsaw and they seem to have enjoyed a good reputation in the community in which they live. As I say I know nothing about them before they came here. The Court knows they have a good standing in the community here. While on the other hand I have known Mrs. Ellis for years. I knew her husband before he died and I have known her family including the defendant in this case. I do know there was a time when they were having some sort of trouble in the home. This little girl was down there and I have seen her around the courthouse here in Warsaw with the mother. The mother was brought back from Louisville on a warrant, and I had the impression and still have that at that time they were trying to get a suitable home for this child or else they might have had to send her to an institution for the care of little children. These people took this little girl at a time when it looked like that might happen. I got that impression from the officers here in the courthouse and from my observation of things at the time and from what I have heard in the trial here today. From the evidence heard I may reasonably conclude that the child is in a good home and I mean Mr. and Mrs. Young have been good to this child. Now the defendant signed the consent of adoption when she was trying to get some one to take the child. She went to Mr. Connley's office, and I have known Mr. Connley for 39 years, and I know how painstaking and careful he is in transacting business of this kind and I am confident when she signed the consent of adoption she understood what it meant when she signed it. I think when she signed it she did so because she was unable to care for the child and she wanted the child to have a home and she preferred it be in a home in Warsaw.

"I don't know what happened or what caused her to change her mind about signing the adoption consent, but having signed the consent of adoption at the time when she did you might say she was facing an impending emergency. The child is in much better physical condition now than it was then, and Gentlemen, I don't feel there is anything else to do for the good of the child except to leave this little girl where she is. Therefore, it is the Court's ruling that the adoption be granted."

The law is well settled that as a general proposition the natural parents of a child have a superior right to its custody above that of all others; but the law has injected into such cases a factor of almost equal dignity to that of the right of the natural parents, and that is the welfare of the child and the superior advantages that adopting parents can furnish the child. But the law will not permit natural parents to be deprived of the custody of their children, even though the children are illegitimate, solely upon the ground they are not in position to provide the superior advantages which the adopting parents might provide. Lee v. Thomas, 297 Ky. 858, 181 S.W.2d 457.

The authorities from other jurisdictions are not altogether in accord on the question whether the parent has the right to withdraw a consent to adoption previously

given. It is stated in 156 A.L.R. 1011: " * * * it must now be said, in view of the later cases * * * that the trend of the more recent authority is toward the position that where a natural parent has freely and knowingly given the requisite consent to the adoption of his or her child, and the proposed adoptive parents have acted upon such consent by bringing adoption proceedings, the consent is ordinarily binding upon the natural parent and cannot be arbitrarily withdrawn so as to bar the court from decreeing the adoption, particularly where, in reliance upon such consent, the proposed adoptive parents have taken the child into their custody and care for a substantial period of time, and bonds of affection, in the nature of a 'vested right,' have been forged between them and the child."

Two recent cases in which this Court discussed this specific question are Lee v. Thomas, supra, and Skaggs v. Gannon, 293 Ky. 795, 170 S.W.2d 12. In the Skaggs' case the natural mother was permitted to withdraw the written consent previously given. In the Thomas case she was not permitted to withdraw her consent. An examination of the two cases will disclose that the decision in each case was based on the particular facts shown by the record.

In this case it will be noted that the mother executed the consent to adoption after she was married to her present husband, and after she had ample time to consider the matter from every angle. The instrument was executed in the office of a reputable attorney, who testified that he fully explained its nature and purpose to the mother. Anna Jane has now been in the home of appellees for almost 2½ years, and bonds of affection have no doubt been forged between them and the child. We find no evidence in the record that any fraud has been practiced on the mother, or that she has been overreached in any manner. As to the mother's complaint she will not be permitted to visit the child, it is noted that appellees testified at the hearing they have no objection to such visits at reasonable times, and under reasonable circumstances.

The trial Judge knows all the parties. He had the opportunity to observe their appearance and demeanor at the hearing, and was in position to decide what will be to the best interest of Anna Jane. In such circumstances, we do not feel that we should disturb the judgment of the Chancellor.

The judgment is affirmed.